Receipt Number
38393

*y y*

ORIGINAL
EX 1-3

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

### SOUTHERN DIVISION

**ARMADA OIL & GAS COMPANY,
INC.**, a Michigan corporation,

        Plaintiffs,

-v-

**NAS COMPANY, CORPORATION**,
a Michigan corporation, and **MARATHON
FLINT OIL COMPANY**, a Michigan
corporation

        Defendant.

_____/

Case: 2:06-cv-10270
Assigned To : Battani, Marianne O
Referral Judge: Scheer, Donald A
Assign. Date : 01/20/2006 @ 10:38 A.M.
Description: CMP ARMADA OIL
V. NAS CO., ET AL(TAM)

**SALEH & ASSOCIATES, PLC**
ALEX SALEH (P56756)
DOUGLAS R. SWATOSH (P66199)
Counsel for Plaintiffs
921 Howard Street
Dearborn, Michigan 48124
(313) 724-8080 / Fax 724-8180

---

## COMPLAINT

---

There is no other pending or unresolved civil action arising
out of the transactions or occurrences alleged in this Complaint.

NOW COMES, Plaintiff, ARMADA OIL & GAS COMPANY, INC. by and through its Counsel, SALEH & ASSOCIATES, PLC and for its Complaint against Defendant, NAS COMPANY, CORPORATION and MARATHON FLINT OIL COMPANY, states as follows:

## JURISDICTION AND VENUE

1.    Plaintiff Armada Oil & Gas Company, Inc. (hereinafter "Armada") is a Michigan corporation that does business in the county of Macomb, state of Michigan.

2.    Upon information and belief, Defendant NAS Company, Corporation, (hereinafter "NAS Company") is a Michigan corporation that does business in the county of Macomb, state of Michigan.

3.    Upon information and belief, Defendant Marathon Flint Oil Company, (hereinafter "Marathon Flint") is a Michigan corporation that does business in the county of Macomb, state of Michigan.

4.    The claims in this action arose in the county of Macomb, state of Michigan.

5.    This action involves a claim for damages resulting from Defendant's violation of the Lanham Act, 15 U.S.C. §1051 et seq.

6.    This complaint is within the Jurisdiction of this Court pursuant to 28 U.S.C.A. § 1338 as herein after more fully appears.

7.    Venue is proper in this court because the Defendants do business in this judicial district and the claims arouse in this judicial district.

## GENERAL ALLEGATIONS

8.    Armada incorporates through reference paragraphs one through seven of this Complaint as if fully set forth herein.

9.     Armada is in the business of selling and distributing petroleum products to gasoline service stations throughout the state of Michigan.

10.     On April 10, 2001, Armada entered into a Branded Jobber Contract and Trade Signage Agreement ("Jobber Contract") with BP Products North America, Inc. (hereinafter "BP") The Jobber Contract is attached hereto as **Exhibit 1**.

11.     Pursuant to section 5, Company's Trade Identities and Image, under the Jobber Contract, Armada has a license to use the BP trade identities and furthermore, Armada's branded service stations are permitted similar use of the BP trade identities in conjunction with the sale of petroleum products.

12.     Such BP trade identities are defined therein, *inter alia*, brand names, logos, color patterns, design schemes, image standards and the like.

13.     Armada agreed under the Jobber Contract/license that it would not at any time allow any act to be taken which would in any way impair BP's rights in and to the BP and Amoco trade identities.

14.     The BP trade identities include but are not limited to the following United States trademarks: No. 76243740 (**Exhibit 2**) and No. 76193397 (**Exhibit 3**).

15.     On October 17th, 1997 NAS Company and BP entered into Dealer Supply Agreement (the "Supply Agreement.")

16.     The Supply Agreement was assigned from BP to Armada on May 17, 2005.

17.     Armada has supplied NAS Company with BP-branded petroleum products beginning on or about May 17, 2005.

## COUNT I
## VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1051
## TRADEMARK INFRINGEMENT

18.     Armada incorporates through reference paragraphs 1 through 17 of this Complaint as if fully set forth herein.

19.     For years prior to the incidents alleged in this Complaint, BP and Armada as a licensee of BP have used the BP and Amoco trademarks and trade identities in interstate commerce to distinguish its products and services, specifically for the retail sale of petroleum products at service stations.

20.     Upon information and belief NAS Company purchased and sold non-BP branded motor fuel at its respective service station, located at 116 S. Gratiot, Mount Clemens, Michigan 48043.

21.     Upon information and belief, Marathon Flint willfully sold non-BP branded motor fuel for resale at the motor fuel service located at 116 S. Gratiot, Mount Clemens, Michigan 48043.

22.     By selling non-BP petroleum products under the "BP" Trademarks, Defendants NAS Company and Marathon Flint have created confusion or the likelihood of confusion as to the origin, approval, sponsorship, or endorsement of said petroleum products and/or other related goods or services.

23.     By selling non-BP branded petroleum products a under the "BP" trademarks, Defendants NAS Company and Marathon Flint have misrepresented the nature, characteristics, qualities, or origin of the petroleum products sold at said gas stations.

24.     Defendants NAS Company and Marathon Flint's conduct as set forth in this Count has caused a dilution of the distinctive quality of the "BP" trademarks.

25.     Defendants NAS Company and Marathon Flint's conduct as set forth in this Count was conducted with a willful and bad faith intent to trade under the "BP" trademarks and to dilute said trademarks.

26.     Defendants NAS Company and Marathon Flint's conduct as set forth in this Count has caused Armada extensive damage including but not limited to lost profits, and damage to its goodwill, business identity, business opportunities, and business reputation.

## PRAYER FOR RELIEF

Armada respectfully requests that this honorable Court enter judgment against Defendants NAS Company and Marathon Flint sufficient to compensate Armada for the actual, incidental, and consequential damages it has sustained as a result of Defendants NAS Company and Marathon Flint's actions, and for profits unjustly obtained by the Defendants, treble damages as allowed by federal law, interest, costs, and attorney fees, as well as any additional remedies at law or equity that this Court deems just.

## COUNT II
## UNFAIR COMPETITION

27.     Armada incorporates through reference paragraphs 1 through 26 of this Complaint as if fully set forth herein.

28.     Armada finances the construction and imaging and branding of gasoline retail service stations under the "BP" trademarks throughout the state of Michigan.

29.     Armada sells petroleum products to gasoline retail service stations throughout the state of Michigan with the contractual understanding that said stations will resell said petroleum products under the "BP" trademarks.

30.     Under the Supply Agreement NAS Company promised to act as a BP-branded dealer.

31.     Under the Supply Agreement, NAS Company, was granted the non-exclusive right to use the "BP" trademarks as a trademark on and in connection with the resale of gasoline as provided for in the Supply Agreement.

32.     Under the Supply Agreement NAS Company, promised to not use the "BP" trademarks in the selling of products other than those purchased from Armada.

33.     NAS Company has in the past and does currently purchase petroleum products from a person other than Armada and not a BP-branded supplier, and does resell said products to customers at the Retail Outlet.

34.     Marathon Flint has in the past and is currently in the process of willfully selling petroleum products to BP branded service stations under supply contracts with the Armada.

35.     By reselling under the "BP" trademarks petroleum products they purchased from a third party, NAS Company has created confusion or the likelihood of confusion as to the origin, approval, sponsorship, or endorsement of said petroleum products and/or other related goods or services.

36.     By purchasing products from a third party supplier and reselling said products at the Retail Outlet under the "BP" trademarks, NAS Company has misrepresented the nature, characteristics, qualities, or origins of the petroleum products sold at the Retail Outlet.

37.    By selling petroleum products to service stations under contract with Armada that operate under the BP trademark and trade identities, Marathon Flint has created confusion or the likelihood of confusion as to the origin, approval, sponsorship, or endorsement of said petroleum products and/or other related goods or services.

38.    The conduct of Defendant as set forth in this Count has caused extensive damage to BP and Armada including but not limited to lost profits, and damage to its goodwill, business identity, business opportunities, and business reputation.

## PRAYER FOR RELIEF

Armada respectfully request that this honorable Court enter judgment against Defendants NAS Company and Marathon Flint in an amount sufficient to compensate Armada for the actual, incidental, and consequential damages it has sustained as a result of the Defendants' actions, and for profits unjustly obtained by the Defendants, an injunction ordering NAS Company to cease and desist its purchase of petroleum products for resale at the Service Station from any person other than Armada, an injunction ordering Marathon Flint to cease and desist selling petroleum precuts to any service station under contract with Armada, as well as interest, costs, and attorney fees and any additional remedies at law or equity that this Court deems just.

Respectfully Submitted,

**SALEH & ASSOCIATES, PLC**

Alex Saleh (P56756)
Douglas R. Swatosh (P66199)
Counsel for Plaintiff
921 Howard
Dearborn, Michigan 48124
(313) 724-8080 / Fax 724-8180

Dated:  January 18, 2006

# EXHIBIT 1





**bp**

**Branded Jobber Contract
(Retail)**

This branded jobber contract ("Contract"), dated _____ April 10, 2001 _____ is by and between

☐ Amoco Oil Company, a Maryland corporation, or its successor and/or as the case may be

☒ BP Exploration & Oil Inc., an Ohio corporation, or its successor
with such entity designated by an "x" before its name and hereinafter referred to as "Company," and with a principal office located at

**4850 East 49ᵗʰ Street, Cuyahoga Hts, OH 44125**
(State complete Company address including street address, city and zip code)

and _____ **Armada Oil & Gas Co., Inc** _____ ("Jobber")
(State exact legal name of Jobber)

a _____ **Corporation** _____ with its principal offices located at
(State type of legal entity, corporation, partnership, LLC, sole proprietorship, etc.)

**13530 Michigan, Dearborn MI 48126**
(State complete address of Jobber's principal office including street address, city and zip code. A post office box is not sufficient.)

Now, Therefore, Company and Jobber, intending to be legally bound, agree to the following.

**1. Term.** The term covered by this Contract will be for a period of ▓▓▓ year(s) beginning on ▓▓▓▓▓▓ and ending on ▓▓▓▓▓▓▓▓▓, unless terminated earlier by law or by the terms of this Contract or unless extended by Company upon written notice. If the franchise relationship underlying this Contract continues for any reason beyond the expiration date indicated above, this Contract will be extended until terminated or until superseded by a new branded jobber contract, if offered.

**2. Products, Quantities and Approved Retail Sites.**
(a) **Products and quantities to be purchased/Resale from Approved Retail Sites (Attachment A).** Company agrees to sell and Jobber agrees to purchase and receive Company's currently offered and available branded petroleum products as determined and designated by Company ("Products"), and as more fully and specifically set forth in Attachment A, a copy of which is attached to and incorporated in this Contract. Jobber agrees to purchase these Products ratably in the quantities set forth in Attachment A within every continuous 12-month period, or any portion thereof, during the term of this Contract. Attachment A will also set forth, among other things, the retail sites approved under paragraph 6(a) below from which the Products purchased from Company may be resold ("Approved Retail Sites"). Products purchased under this Contract will not be resold, under Company's Trade Identities (as defined in paragraph 5(a) below), from any location unless and until said location is set forth on Attachment A and/or unless and until said location has been approved pursuant to paragraph 6(a) below. Jobber will advise Company immediately if it is no longer able to supply an Approved Retail Site listed in Attachment A. The cessation or reduction in supply of Products to an Approved Retail Site will not reduce the Jobber's annual Product purchase requirements set forth on Attachment A, without Company's written consent.

(b) **Annual development of Attachment A.** Jobber will provide the following information to Company between January 1 and February 15 of each Contract year of the Contract term, or at any other times requested by Company, for the purpose of developing each and every Attachment A for each Contract year of the Contract term: the quantities of all Products supplied to and resold during the prior calendar year, by Product grade, at each Approved Retail Site. Company may also require that Jobber provide an estimate of any additional quantities of Products that it expects to purchase and supply during any Contract year, by Product grade, for any and all sites that are newly approved during said year. Company may use this estimate to amend or develop a new Attachment A. In the case of a trial franchise, Jobber will provide, 90 days prior to the beginning of the Contract term, its estimate of the quantities of all Products that it expects to purchase and supply during the Contract year, by Product grade, at each of its newly Approved Retail Sites.

Page 1

(c) **Annual Minimum Quantities (Attachment A-1).** In addition to the other terms and conditions contained in the Contract pertaining to Jobber's obligation to purchase certain quantities of Products, including but not limited to those obligations contained in Attachment A, Jobber will be required to purchase a minimum quantity of Products during each continuous 12-month period of the Contract term, as determined and designated by Company and as more fully set forth in Attachment A-1, a copy of which is attached to and incorporated in this Contract.

(d) **Company's directly-supplied sites.** Jobber will not sell, supply or deliver any Products purchased under this Contract to any retail location that is directly-supplied by Company or that is designated by Company as a directly-supplied location

## 3. Price of Products, Jobber's Designated Terminals, Title and Risk of Loss.

(a) **Prices.** The price which Jobber will pay for each Product sold under this Contract will be Company's jobber buying price, as recorded at the applicable Company business unit office, regional office or such other office as Company may designate from time to time, in effect on the date and at the time of sale from the respective terminals designated by Company ("Jobber Buying Price"). All terminals where Jobber will take delivery of the Products sold under this Contract will be determined and designated by Company ("Jobber's Designated Terminals") and set forth in Attachment A, as amended from time to time. In addition to the applicable Jobber Buying Price, Jobber will also pay all other applicable charges, including but not limited to, those charges categorized in paragraph 25 below.

(b) **Title and risk of loss.** Title and risk of loss to all Products sold to Jobber under this Contract will pass to Jobber f.o.b. Jobber's Designated Terminals at the time of loading into Jobber's transport equipment, including any contract carrier equipment engaged by Jobber.

## 4. Payment Terms.

(a) **Credit.** Nothing in this Contract will be construed as obligating Company to extend credit to Jobber. In the event Company does extend credit to Jobber, such extension of credit will be subject to Company's established credit terms, as amended from time to time, and to the following requirements, including but not limited to: submitting an annual financial statement and executing an unlimited guaranty. Jobber will also provide Company with a letter of credit, deposit or other forms of security, along with interim financial statements, upon Company's request. Company reserves the right to change its credit terms at any time either for the class of trade generally or for Jobber individually and, among other things, to require that Jobber pay for all Products and services under this Contract – in advance or at the time of delivery --in cash, in certified funds or via wire transfer. In no instance will the terms of any sale discounts apply to taxes, inspection fees and the like. One or more incidents of: failure by Jobber to timely or fully pay according to established credit terms, including a check or electronic funds transfer that is presented and dishonored for nonsufficient or uncollected funds; or failure to supply required or requested financial information or security; financial distress or a determination by Company that Jobber may be unable to timely or fully pay in the future, will entitle Company to suspend deliveries, impose pre-pay or cash-on-delivery ("COD") terms, require additional security and/or terminate this Contract, in addition to exercising any other rights Company may have under this Contract or at law.

(b) **Jobber payments made via EFT.** Jobber will pay for all Products, open account items and all other items and services under this Contract via electronic funds transfer ("EFT"), or by such other methods as Company may require. Jobber will establish an account with a financial institution, on terms acceptable to Company, that provides EFT services and will authorize Company to initiate transfers of funds between Jobber's account and Company's accounts for payment of any and all amounts due to Company under this or any other Contract. Jobber will provide Company with all information and authorization necessary to debit and credit Jobber's account via EFT. These drafting authorities will remain in full force and effect during the entire term of this Contract giving Company the right, at all times, to withdraw funds for sums owed to Company from Jobber's account, via EFT.

(c) **Finance and service charges.** Company will, at its election, assess finance charges on all amounts not paid by Jobber on the net due date. Finance charges will be assessed monthly at an annualized rate of either 8% or 2% over the highest Prime Rate published in the Wall Street Journal ("Money Rates" section) on the last business day of the month preceding the assessed charge, whichever rate is higher. Company reserves the right to change this finance charge rate at any time without prior notice to Jobber. Company will also impose a service charge for each check and/or EFT which is dishonored for nonsufficient or uncollected funds, whether or not subsequently paid by Jobber. All charges assessed by Company hereunder will be collected by withdrawing funds from Jobber's account via EFT.

(d) **Company invoices.** Other than those disputes governed by paragraph 20 below, Jobber must notify Company in writing of disputes regarding any charges or other items on any Company invoice or statement within 60 days after Jobber's receipt of same. If Jobber fails to dispute a charge or other item within this 60 day period, the invoice or statement in question will be presumed to be accurate.

5.  Company's Trade Identities and Image.

(a) **Use of Trade Identities generally.** Jobber will be permitted to use, and will be permitted to allow the jobber-dealers and sub-jobbers it supplies with Products purchased under this Contract ("Jobber-Marketers") to use -- on a non-exclusive, limited, site-specific basis at Approved Retail Sites -- certain and specifically designated Company service marks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and the like (individually and collectively, "Trade Identities") in connection with the advertising, distribution and/or resale of the Products authorized by, supplied by and/or purchased from Company under this Contract. Company's Trade Identities may include those in use at the time this Contract is executed and may also include, in the Company's sole discretion, those Trade Identities that the Company may subsequently develop, adopt or otherwise obtain through licenses or other means. Company will retain, at all times, the right to determine which Trade Identities will be used or displayed, and the manner of their use or display, at an Approved Retail Site and the right to restrict the use or display of certain Trade Identities to certain Approved Retail Sites (or to certain locations at an Approved Retail Site). Company will also have the right, at any time and for any reason, to revoke its approval to use certain or all of its Trade Identities at certain or all Approved Retail Sites (or at certain locations at an Approved Retail Site) -- as further provided in paragraphs 5(e) and 6(b) below -- and, where applicable and in its sole discretion, to substitute any other Trade Identities in their place.

(b) **Use of Trade Identities governed by this Contract, related agreements and related guidelines, etc.** The permission to use Company's Trade Identities will be governed by the terms and conditions of this Contract and related agreements, including all attachments, schedules, appendices and amendments attached to and incorporated in those agreements. In addition, Company's Trade Identities will only be used in accordance with -- and only if Jobber complies with --the guidelines, policies, procedures, programs, requirements, specifications, standards (both operational and visual) and strategies issued by Company, as amended from time to time.

(c) **Use of Trade Identities on signage.** Jobber will be permitted to acquire and display approved signage bearing Company's Trade Identities, in connection with the advertising, distribution and/or resale of Products under this Contract, on an Approved Retail Site-specific basis. Under no circumstances will Jobber be allowed to relocate signage bearing Company's Trade Identities to another location without Company's consent. Jobber will provide Company with a list of all signage bearing Company's Trade Identities in Jobber's possession and/or control and the location of said signage, upon Company's request. In addition to the terms and conditions of this Contract, the use of Company's Trade Identities on all signage and the use of that signage generally will be governed by a Trade Signage Agreement (Jobber), a copy of which is attached to and incorporated in this Contract.

(d) **Use of Trade Identities in conjunction with the sale of Representative Amounts of certain Products.** At all times at each Approved Retail Site, including each Jobber-Marketer Approved Retail Site, Jobber will offer for sale, or cause to be offered for sale, representative amounts of each grade of Company-designated Products that are necessary, in Company's discretion, to satisfy public demand ("Representative Amounts"). If Jobber ceases to offer or make available one or more of these designated Products in the required Representative Amounts at an Approved Retail Site, Jobber will cease using or displaying, or cause its Jobber-Marketers to cease using or displaying, Company's Trade Identities at that site.

(e) **Use of Trade Identities in conjunction with Company's retail marketing strategies and development plans, image programs and standards.** At each Approved Retail Site, including each Jobber-Marketer Approved Retail Site, Jobber will comply with, and ensure that all of its Jobber-Marketers comply with, Company's then current image programs and standards (both operational and visual), as amended from time to time. As part of this image compliance requirement, Jobber will ensure that no items of a pornographic or sexually explicit nature are displayed, used, stored, offered, rented or sold at any Approved Retail Site. For purposes of this Contract, items of this nature will include, but will not be limited to, pornographic, sexually explicit or so-called "adult" magazines; videotapes; compact disks; digital video disks; or like materials. Jobber also agrees that its right to use Company's Trade Identities under this Contract will be subject to Company's then current retail marketing strategies and development plans, as amended from time to time. If an Approved Retail Site no longer conforms or fails to conform to Company's then current retail marketing strategies and development plans, as amended from time to time, or to Company's then current image programs or standards (both operational and visual), as amended from time to time, Company may revoke its prior approval to use certain or all of its Trade Identities at the Approved Retail Site, in which case Jobber will cease using or displaying, or cause its Jobber-Marketer to cease using or displaying, certain or all of Company's Trade Identities at that site, whichever the case may be.

(f) **Use of Trade Identities on Jobber's property including websites.** Jobber will be permitted to display Company's Trade Identities in conjunction with Jobber's websites, business forms, advertising materials, structures, vehicles, and other Jobber property directly related to the advertising, distribution and/or resale of Products under this Contract. Jobber may only do so, however, if the words "Products Distributor" or "Products Jobber" appear immediately adjacent to the displayed location of said Trade Identities. Company will have the right to approve such use of its Trade Identities in advance and to revoke its approval at any time and for any reason. If Company exercises its right to revoke, terminate or nonrenew or if the property in question is sold or otherwise transferred, Jobber will immediately cease using or displaying, or cause any third party to immediately cease using or displaying -- or will immediately remove, cover or obliterate, or cause any third party to immediately remove, cover or obliterate -- the Trade Identities on the property in question.

(g) **Misuse of Trade Identities with Jobber's company name or Jobber's own trade identities.** Jobber will not use any of Company's Trade Identities as part of Jobber's company name. If Jobber has formed a company or has acquired a company that uses any of Company's Trade Identities as part of Jobber's company name, it will be required to amend its articles of incorporation or organization so as to delete Company's Trade Identities from its company name. Likewise, Jobber will not use any of Company's Trade Identities as part of Jobber's own trade identities. If Jobber has developed trade identities or has acquired trade identities that incorporate any of Company's Trade Identities as part of Jobber's trade identities, it will be required to delete Company's Trade Identities from its own trade identities.

(h) **Misuse of Trade Identities in connection with certain sales.** Jobber will not use any of Company's Trade Identities in connection with the advertising, distribution and/or resale of: (1) any dilution or adulteration of a Product authorized by, supplied by and/or purchased from Company; (2) any mixture or blend of Products authorized by, supplied by and/or purchased from Company, without Company's prior written consent (which consent may be revoked at any time and for any reason); (3) any Product authorized by, supplied by and/or purchased from Company but sold under an incorrect or inappropriate Company Mark or sold through unapproved or disapproved packages, containers or equipment; or (4) any product not authorized by, supplied by and/or purchased from Company.

(i) **Company's right to audit.** To verify Jobber's performance under this Contract and related agreements or as part of a Company compliance program, as issued and amended from time to time, Company will have the right to: audit records in the possession or control of Jobber or its Jobber-Marketers; inspect all Approved Retail Sites; and sample all Products in the possession or control of Jobber and/or its Jobber-Marketers. Jobber will cooperate fully and completely throughout the audit and inspection processes, and ensure that its Jobber-Marketers cooperate fully and completely. If Jobber designates its records as confidential, Company will not voluntarily disclose said information to anyone without Jobber's written consent, except to those Company employees and agents with a need to know.

(j) **Discontinued use of Trade Identities upon expiration or termination of this Contract.** Upon the expiration or termination of this Contract, for any reason, Jobber will immediately cease using or displaying, and cause its Jobber-Marketers to cease using or displaying, Company's Trade Identities and will dispose of all signage in accordance with the Trade Signage Agreement. All remaining evidence of Company's Trade Identities will be immediately obliterated by Jobber. If Jobber does not immediately cease using or displaying, and cause its Jobber-Marketers to cease using or displaying, Company's Trade Identities, Company will have the irrevocable right to use any means necessary to remove, cover or obliterate the Trade Identities, including entering upon the relevant premises or filing a legal action, with Jobber's full and complete cooperation and at Jobber's expense. Jobber will reimburse Company for all expenditures incurred in removing Company's Trade Identities hereunder.

**6. Site Approval.**

(a) **Use of Company's Trade Identities at each Approved Retail Site.** It is and will be an on-going condition of the right to use Company's Trade Identities under this Contract, that Jobber must first obtain Company's prior written consent for each and every location that Jobber desires to identify with Company's Trade Identities, including all Jobber-Marketer retail locations. The approval and designation as an Approved Retail Site will be within Company's sole discretion and will be based on certain factors and upon certain criteria relative to the site, including but not limited to: current or proposed appearance; current or proposed Trade Identities to be used; location of underlying real estate; ownership status of underlying real estate; current or proposed mode of operation; current or proposed offer; current or projected volume; current or proposed hours of operation; current or proposed training capabilities; current or proposed improvements, facilities or equipment; enrollment or participation in the Company's "mystery" shop program; Company's then current image programs and standards (both operational and visual), as amended; or Company's then current or amended retail marketing strategies and development plans in the vicinity of the proposed location, or elsewhere. For purposes of emphasis and elaboration, but without limitation, Company will have the right to require gasoline dispensers to be covered by approved canopies and to be equipped with approved card readers. Company will also have the right to determine the appropriate geographic density and channel-of-trade mix for all retail locations identified and/or to be identified with Company's Trade Identities. It will be a further requirement that Jobber has used and/or is using its best efforts to develop, operate and/or supply its then currently Approved Retail Sites. Company's right of approval hereunder will also apply to those situations where Jobber desires to supply a retail location that is then currently identified with Company's Trade Identities but supplied by another branded jobber or other supplier of Company's Products. Company will retain, at all times, the right to determine or the right to approve which Trade Identities will be used or displayed, and the manner of their use or display, at an Approved Retail Site and the right to restrict the use or display of certain Trade Identities to certain Approved Retail Sites (or to certain locations at an Approved Retail Site).

(b) **Site approval revoked.** Company will have the right to revoke its prior approval identifying an Approved Retail Site if the site no longer conforms to or fails to conform to: the terms or conditions of this Contract and related agreements; the Company's then current image programs or standards (both operational and visual), as amended from time to time; the Company's then current retail marketing strategies and development plans, as amended from time to time; or to any relevant law or regulation. Company will also have the right to revoke its prior approval identifying an Approved Retail Site based upon, but not limited to, the factors and criteria set forth in paragraph 6(a) above. For purposes of emphasis and elaboration, but without limitation, Company will have the right to revoke its prior approval identifying an Approved Retail Site if – after 6

months from Company's request – the site is not identified with approved Trade Identities or the gasoline dispensers at the site are not covered by approved canopies or said dispensers are not equipped with approved card readers. If Company revokes its approval, Jobber will immediately cease using or displaying, or cause its Jobber-Marketer to cease using or displaying, Company's Trade Identities at that retail location. Company will also have the right, at any time and for any reason, to revoke its prior approval to use certain or all of its Trade Identities at certain or all Approved Retail Sites (or at certain locations at an Approved Retail Site) and, where applicable and in its sole discretion, to substitute any other Trade Identities in their place.

(c) **Jobber's right to supply disapproved or revoked sites.** Nothing in this Contract will prevent Jobber from supplying a disapproved retail location or a retail location at which Company's approval has been revoked provided that Jobber does not permit Company's Trade Identities to be displayed at that location.

(d) **Discontinued use of Trade Identities at retail location.** Company will have the right to cause any and all signage bearing Company's Trade Identities to be removed, or to cause Company's Trade Identities on said signage to be removed, covered or obliterated, from any disapproved retail location or from any retail location at which Company's approval has been revoked. If Jobber does not immediately cease using or displaying, or cause its Jobber-Marketer to cease using or displaying, certain or all of Company's Trade Identities after Company's request to do so, Company will have the irrevocable right to use any means necessary to remove, cover or obliterate the Trade Identities, including entering upon the relevant premise or filing a legal action, with Jobber's complete cooperation and at Jobber's expense. Jobber may be required to reimburse Company for all expenditures incurred in removing its Trade Identities hereunder.

(e) **All Approved Retail Sites listed on Attachment A.** In accordance with the terms of this Contract, all Approved Retail Sites that are operated and/or supplied by Jobber will be listed on Attachment A. Jobber will provide Company, among other things, with the complete address for each Approved Retail Site listed. All retail locations at which Company's approval has been revoked will be removed from Attachment A.

**7.  Marketing Responsibility at Approved Retail Sites.**
(a) Jobber to use best efforts to market at each Approved Retail Site. Jobber will use its best efforts to market, or cause to market, the Products covered by this Contract at each and every Approved Retail Site and within the trade area of each and every Approved Retail Site.

(b) **Marketing within the trade area of an Approved Retail Site not exclusive.** This Contract does not confer upon Jobber exclusive marketing rights and/or trademark rights within any trade areas. Company will, at all times and for any reason, maintain its sole and unlimited right to make other provisions for the marketing of its Products and services under any of its Trade Identities within the trade areas of Jobber's Approved Retail Sites, or elsewhere, including but not limited to: establishing its own directly-operated, contractor-operated, or commission marketer retail locations; establishing its own directly-supplied reseller/dealer retail locations; and/or approving retail locations to be operated or supplied by other jobbers.

**8.  Payment Methods Including Credit Cards.**
(a) **Company's Payment Methods Program.** Company may from time to time endorse and sponsor specific proprietary and third party payment methods including certain credit cards, charge cards, fleet cards, debit cards, pre-paid cards and the like (individually or collectively, "Payment Methods") for use at all specified retail locations selling Company's Products. Company will not be obligated to sponsor or participate in any specific Payment Methods program, or may withdraw its sponsorship of, or participation in, any such program at any time, or may condition any sponsorship or participation upon payment of service and equipment fees by Jobber. If Company does sponsor a Payment Methods program ("Payment Methods Program"), Jobber agrees that Company's proprietary Payment Methods and all third party Payment Methods specified by Company will be accepted at each payment point (including card-readers-in-dispensers, if present) at each of Jobber's Approved Retail Sites, including each payment point at each Jobber-Marketer Approved Retail Site. Jobber will strictly comply with the operating rules, terms and conditions of any Payment Methods Program that Company may sponsor, by and through any manuals, bulletins, or other forms of written or electronic communications, as issued and as amended from time to time. Company will have the right to charge back sales transaction amounts -- made by Jobber's customers or by customers of its Jobber-Marketers – for a period of 6 months from the date of a transaction. Jobber must maintain, or cause to maintain, a record of each transaction (including the actual draft generated at the time of sale) for a period of 6 months.

(b) **Electronic point-of-sale equipment, software and firmware.** Jobber will comply with Company's point-of-sale policies and guidelines, as amended from time to time, and will equip, or cause to equip, all of its Approved Retail Sites with electronic point-of-sale ("EPOS") equipment approved by Company for processing transactions on Company's Payment Methods network. All such Company-approved EPOS equipment will, at all times, be connected to Company's Payment Methods network and will be operated using Company's most current Payment Methods software and firmware. Jobber will install Company's most current software and firmware within 6 months of its release. Unless otherwise specified, no right, title or ownership interest in any software or firmware will be transferred to Jobber. Jobber acknowledges that the software and firmware and the specifications are proprietary products of Company or its vendors. Under no circumstances will Jobber reverse engineer, decompile, disassemble or otherwise attempt to derive the source code for the software or firmware or alter its intended functionality. Within 6 months of Company's request, Jobber will pay any and all additional or new costs or fees

associated with the operation of the EPOS equipment, including but not limited to costs associated with satellite connections, access and telecommunications and upgrading the EPOS equipment or related software or firmware

**9.  Additional Jobber Responsibilities.**
(a) **Bulk plants.** Jobber will operate, where necessary, one or more bulk storage plants so as to efficiently perform its supply and distribution functions under this Contract.

(b) **Transport and tank trucks.** Jobber will operate or cause to operate, where necessary, a sufficient number of transport and/or tank trucks so as to efficiently perform its delivery functions under this Contract.

(c) **Deliveries for Company.** From time to time, Company may request that Jobber make deliveries, from Jobber's inventories of Products purchased under this Contract, to other Company customers. If Jobber elects to make any such deliveries, Company will pay Jobber a mutually agreed upon handling fee.

(d) **Jobber Market Plans.** As part of Company's Jobber Market Planning Process, as amended from time to time, Jobber will provide Company – at a minimum – with a 3-year jobber market plan, in a format provided by or acceptable to Company. Jobber will update its jobber market plan each year, also in a format provided by or acceptable to Company. If Jobber designates its jobber market plan as confidential, Company will not voluntarily disclose said information to anyone except to those Company employees and agents with a need to know.

(e) **Emergency notification procedures.** From time to time Company may provide Jobber with notification procedures to be utilized if and when emergency situations or other situations occur at any Approved Retail Site and/or if and when such situations directly or indirectly involve the Trade Identities being utilized by Jobber. For purposes of this Contract, reportable situations may include, but may not be limited to: death or serious injury; transport or tank truck accidents; Product spills or other incidents of significant environmental impact and other significant events as defined from time to time. Jobber agrees that it will comply with said procedures, if and when provided, and if and when a defined, reportable situation occurs.

(f) **Communication with Company via the Internet.** Within 6 months of Company's request, Jobber must be equipped with e-mail capability and access to the Internet so that Company may communicate and exchange information with Jobber via the Internet and via the Company's intranet, extranet and/or web pages.

(g) **Customer inquiries and complaints.** Jobber will develop a program designed to respond to and resolve customer inquiries or complaints within no less than 10 business days of receipt. This program will apply to inquiries and complaints regarding an Approved Retail Site, including its Jobber-Marketer Approved Retail Site, that are either received directly by Jobber or those referred to Jobber by Company.

(h) **Mystery shop program.** If Company sponsors or conducts a "mystery" shop audit program, Jobber will enroll and participate in such a program at each Approved Retail Site selected by Company. Jobber will promptly take corrective measures at each and every Approved Retail Site that scores below the target score established by Company for the marketing area that includes said Approved Retail Site. If Jobber desires to use its own "mystery" shop service, said vendor must: (1) be approved by Company in writing; (2) use Company's approved "mystery" shop forms; and (3) provide Company with audit results promptly, using said forms. Company reserves the right to withdraw its approval of any "mystery" shop service at any time and for any reason.

(i) **Branded lubricants and motor oils.** Jobber will use its best efforts to offer for sale Representative Amounts of certain and specifically designated lubricants and motor oils at each of its Approved Retail Sites, including its Jobber-Marketer Approved Retail Sites.

**10. Jobber as Independent Business/Sale of Competitive Products.**
(a) **Independent business.** Company and Jobber are and will remain separate and independent businesses. None of the provisions of this Contract are intended to provide a party hereto with any management direction or control over the other party's business, business operations or employees. Jobber has no authority to act, or employ any person to act, as an agent for or on behalf of Company. Jobber will not place or allow the placement of any signage upon or near any premises owned, leased, operated or supplied by Jobber which might indicate that Company is the owner or operator of the business conducted upon said premises.

(b) **Sale of competitive products.** Subject to paragraph 5(h) above and all other applicable provisions of the Contract, nothing in this Contract will prevent Jobber from purchasing, supplying or reselling the products of Company's competitors. In the event that Jobber does purchase and resell competitive-brand products, it will comply with the applicable terms and conditions of this Contract and all applicable guidelines, policies, procedures, requirements, specifications and standards issued by Company, as amended from time to time, including any policies pertaining to the proper handling of non-Company motor fuels.

**11. Jobber-Marketers.**

(a) **Acts and omissions of Jobber-Marketers imputed to Jobber.** Subject to paragraph 26 below, Jobber will inform those Jobber-Marketers permitted to use Company's Trade Identities of the specific terms and conditions of this Contract and all related agreements, including all attachments, schedules, appendices and amendments attached to and incorporated in those agreements which pertain to the use of Company's Trade Identities and related matters. In addition, Jobber will inform those Jobber-Marketers of the specific guidelines, policies, procedures, programs, promotions, requirements, specifications, standards (both operational and visual) and strategies periodically issued by Company, as amended from time to time, which pertain to the use of Company's Trade Identities and related matters. Notwithstanding the Jobber's best efforts to ensure its Jobber-Marketers' compliance, and regardless of any contractual relationship between Jobber and its Jobber-Marketer, any act or omission by a Jobber-Marketer that, if committed or omitted by Jobber would place Jobber in violation of this Contract or related agreements, will be imputed to Jobber and will give Company the right, in its sole discretion, to take appropriate action against Jobber up to and including site approval revocation or termination of this Contract.

(b) **Actions against Jobber-Marketers.** Nothing in this Contract will prevent or preclude Company from exercising any legal or equitable rights against a Jobber-Marketer directly, separate and apart from any actions taken against Jobber.

**12. Right of First Offer and Right to Purchase.**

(a) **Company's Right of First Offer/Jobber's Company-Branded Assets.** Jobber will not sell, lease or otherwise transfer -- or allow the sale, lease or transfer -- of any assets, or portions thereof, in its possession or control, or in the possession or control or its subsidiaries, affiliates or principals as the case may be, which are related to this Contract and which, at any time during the franchise relationship, have been identified with or by Company's Trade Identities including but not limited to Jobber-owned or leased: Approved Retail Sites; other retail locations; bulk plant and terminal facilities; transport and tank trucks; and all related real and personal property, contract rights, or good will ("Jobber's Company-Branded Assets") without first giving Company a right of first offer to purchase or otherwise acquire the assets in the manner described in paragraph 12(b) below ("Right of First Offer").

(b) **Company's Right of First Offer/Information Jobber Must Provide.** To satisfy its obligations under paragraph 12(a) above, Jobber will promptly submit to Company written notice and a term sheet ("Term Sheet") containing the following items:(i) the Jobber's Company-Branded Assets intended to be sold, conveyed or otherwise transferred; (ii) the amount and nature of consideration sought in the proposed transaction, along with all payment terms; and (iii) all other substantive and commercially reasonable terms intended to be included in the proposed transaction.

(c) **Company's Right of First Offer/60 Days to Exercise.** Upon Jobber's submission of a Term Sheet, and any additional information, facts or data requested by Company to evaluate the Right of First Offer, Company will thereafter have 60 days within which to exercise its Right of First Offer, by written notice. If Company exercises its Right of First Offer, the applicable parties will have an additional 30 days to develop and execute a contract for the sale, conveyance or transfer of the Jobber's Company-Branded Assets in question ("Purchase and Sale Agreement"). Closing will be held at a time and place agreeable to Company and Jobber, but no later than 60 days after a Purchase and Sale Agreement has been signed by the parties.

(d) **Company's Right of First Offer/Right to Sell if Company Doesn't Exercise.** If Company does not exercise its Right of First Offer, Jobber will have the right within a period of 90 days thereafter to execute, or cause to execute, an agreement to sell, convey or otherwise transfer the Jobber's Company-Branded Assets in question to any third party, but only upon terms substantially and commercially identical to those set forth in the Term Sheet. It is specifically agreed that a reduction of up to and including 5% of the consideration set forth in the Term Sheet is a substantially and commercially identical similar term.

(e) **Exception to Company's Right of First Offer.** Notwithstanding paragraph 12(a) above, Jobber will be permitted to sell, lease or otherwise transfer, or cause to sell, lease or transfer, Jobber's Company-Branded Assets to: (i) a spouse, child, son-in-law, daughter-in-law, parent, brother or sister ("Immediate Family Member"), if Jobber is a sole proprietorship; (ii) an Immediate Family Member of a partner's immediate family or of a member's immediate family, if Jobber is a partnership or limited liability company ("LLC"), respectively; (iii) an Immediate Family Member of a stockholder's immediate family, if Jobber is a corporation; or (iv) a fellow partner, fellow member or fellow shareholder("Fellow Stakeholder"), if Jobber is a partnership, LLC or corporation, respectively, without providing Company with a Right of First Offer; provided, however, that each Immediate Family Member or Fellow Stakeholder who receives assets hereunder, is at least 21 years of age with at least one year of active management experience in Jobber's business and, provided further, that no agreement executed in accordance with this paragraph 12(e) will operate as a mere means or device to transfer control or ownership of Jobber's Company-Branded Assets to someone other than an Immediate Family Member or Fellow Stakeholder without providing Company with its Right of First Offer. Regardless of the exception allowed in this paragraph 12(e), Jobber will promptly provide Company with written notice as required under paragraph 12(b) above.

(f) **Company's Right to Purchase/Sale of Jobbership/Change of Control.** Any intended sale, conveyance, alienation, transfer, merger or other intended change of legal or beneficial interest that will result in a change in control of Jobber's corporation, partnership, LLC, sole proprietorship or other entity, whichever the case may be, at any time during the franchise relationship, either voluntarily or involuntarily, by operation of law, by merger or by or through any other type of proceedings, will trigger Company's right to purchase the entirety of Jobber's Company-Branded Assets for a cash price equal to the fair market value of those assets ("Right to Purchase"), as determined by the average of three independent appraisals made pursuant to paragraph 12(g) below, and will be considered a request to assign or transfer the Contract.

(g) **Company's Right to Purchase/Information Jobber must provide/Company's election to appraise.** Pursuant to paragraph 12(f) above, Jobber will promptly provide Company with written notice of an intended change in control. Jobber will also promptly submit to Company complete and fully executed copies of all contract documents that evidence the intended transaction and corresponding change in control, and any information, facts and data requested by Company to evaluate the bona fide nature of said transaction and to evaluate Jobber's request to assign or transfer the Contract. After receiving all requested information, Company will thereafter have 90 days within which to appraise Jobber's Company-Branded Assets and exercise its Right to Purchase (the "90-Day Exercise Period"), by written notice to Jobber. If Company elects to appraise, the process must be initiated in writing within the first 30 days of the 90-Day Exercise Period. The process will consist of three independent Appraisal Institute MAI-certified ("MAI") appraisers -- one chosen by Company within the first 30 days of the 90-Day Exercise period, one chosen by Jobber within the first 40 days of the 90-Day Exercise Period and one chosen by the other two MAI appraisers within the first 50 days of the 90 Day-Exercise Period. Each appraiser will appraise the entirety of Jobber's Company-Branded Assets and provide their respective appraisals within the first 70 days of the 90-Day Exercise Period. Each appraiser will provide Company with a written appraisal and the average of these appraisals will be the price Company would pay, should Company decide to exercise its Right to Purchase. Jobber will cooperate fully and completely with Company by promptly naming an appraiser and by providing any information, facts and data required by Company and/or the appraisers to evaluate and appraise Jobber's Company-Branded Assets. Company and Jobber will each pay for their own appraiser and will each pay one-half of the third appraiser's fee. Closing will be in accordance with paragraph 12(c) above.

(h) **Exception to Company's Right to Purchase.** Notwithstanding paragraph 12(f) above, Jobber will be permitted to effect a sale, conveyance, alienation, transfer, merger or other change of legal or beneficial interest resulting in a change in control of Jobber's corporation, partnership, LLC, sole proprietorship or other entity, whichever the case may be, to an Immediate Family Member or Fellow Stakeholder, without triggering Company's Right to Purchase; provided, however, that the Immediate Family Member or Fellow Stakeholder is at least 21 years of age with at least one year of active management experience in Jobber's business and, provided further, that no transaction executed in accordance with this paragraph 12(h) will operate as a mere means or device to transfer control or ownership of Jobber's Company-Branded Assets to someone other than an Immediate Family Member or Fellow Stakeholder without providing Company with its Right to Purchase. Regardless of the exception allowed in this paragraph 12(h), Jobber will promptly provide Company with written notice as required under paragraph 12(g) above.

(i) **Company's right to verify ownership interest.** From time to time, Company may request and Jobber will provide a confirmation of all shareholder interest (legal and beneficial), partnership interest, membership interest, or other type of ownership interest, whichever the case may be, on a form acceptable to and/or provided by Company. Such confirmation will include the names of all shareholders, partners, members, or owners, whichever the case may be.

(j) **Status of Contract after sale of Jobber's Company-Branded Assets or after change of company control.** In the event of any sale, lease or transfer of Jobber's Company-Branded Assets hereunder, this Contract will continue in full force and effect unless terminated by Company, upon written notice, or unless assigned or transferred by Jobber, upon Company's written consent. Subject to paragraph 13 below, Company's decision not to exercise its Right of First Offer in accordance with this paragraph 12 will not prevent Company from withholding its consent to assign this Contract to any third-party acquirer including any Immediate Family Member or Fellow Stakeholder. In addition, and also subject to paragraph 13 below, Company's decision not to exercise its Right to Purchase in accordance with this paragraph 12 will not prevent Company from withholding its consent to assign or transfer this Contract to any third-party acquirer and/or newly formed entity, including any acquirer or entity that is managed by or on behalf of any Immediate Family Member or Fellow Stakeholder.

(k) **Company may assign its Right of First Offer and/or its Right to Purchase.** Company will have the right to assign its Right of First Offer or its Right to Purchase to one or more third-party purchasers of its choosing.

### 13. Assignment.

(a) **Jobber's prior written request and Company's written consent required.** Jobber acknowledges and understands that the current ownership and control of Jobber is a material element in Company's willingness to enter into this Contract. Jobber, therefore, agrees that it will not assign or transfer its interest in this Contract, or any franchise relationship attendant thereto, without a prior written request and without Company's corresponding written consent; provided, however, that Company will not unreasonably withhold its consent, and provided further, that Company will consent to Jobber's request to assign or transfer this Contract to an Immediate Family Member or Fellow Stakeholder designated by Jobber if said Immediate Family Member or Fellow Stakeholder meets all of Company's then current qualifications for new jobbers, including but not limited to, those qualifications related to financial responsibility, creditworthiness, physical and mental fitness, moral character and business experience.

(b) **Company may withhold consent.** In giving its consent to any assignment, whether voluntarily or by operation of law, Company may, at its election, condition its consent upon: (1) the agreement of the proposed assignee or transferee to enter into a trial franchise; (2) the agreement of the Jobber to simultaneously enter into a mutual cancellation of this Contract and related agreements; and (3) the satisfaction of all indebtedness owed by Jobber to Company. In addition, nothing stated in this paragraph 13 or elsewhere will limit Company's right to impose other or additional conditions on its consent or limit Company's right to withhold its consent for any reason, including but not limited to, a decision by Company to limit or reduce the number of jobbers in a geographic area.

(c) **Effect of assignment without Company's consent.** Jobber agrees and acknowledges that any attempted or purported assignment or transfer of this Contract without Company's knowledge and/or Company's prior written consent may result in the termination of this Contract and the non-renewal of any franchise relationship.

(d) **Company may assign.** Company may assign this Contract to a subsidiary, affiliate or successor of Company or to a third party.

### 14. Indemnity.

Jobber agrees to indemnify, defend and hold Company, including but not limited to Company's parents, subsidiaries, affiliates and all officers, directors, shareholders, employees and agents of Company, its parents, subsidiaries and affiliates, harmless from and against all losses, suits, claims, damages (consequential or otherwise), demands, causes of action, liabilities, fines, penalties, costs or expenses (including reasonable attorney's fees and other costs of defense) of whatever kind and nature, directly or indirectly arising in whole or in part out of: (a) any default or breach by Jobber of any obligation contained in this Contract or any other agreement with Company; (b) the receipt, shipment, delivery, storage, handling, use, sale, dispensing, labeling, invoicing, advertising or promoting of the Products by Jobber or its Jobber-Marketers; (c) any act of commission or omission at an Approved Retail Site; (d) the use of any Company property (real or personal) by Jobber or its Jobber-Marketer; (e) any allegation of agency or other alleged legal relationship by which Company is being held or might be held responsible for the acts or omissions of Jobber or its Jobber-Marketers; (f) the use of Company's Trade Identities by Jobber or its Jobber-Marketers, including the use of said Trade Identities on signage and in the advertising or promoting of Products sold or services rendered by Jobber or its Jobber-Marketers; (g) the violation of any federal, state or local law, rule, regulation, court order or government directive by Jobber, its Jobber-Marketers, or any other customers of Jobber or customers of its Jobber-Marketers; (h) all taxes incurred and owed by Jobber or its Jobber-Marketers of whatever kind and nature; (i) the revocation of any prior approval to use or display, or the loss of any right to use or display, any or all of Company's Trade Identities; (j) Jobber's termination of any franchise or non-renewal of any franchise relationship with its Jobber-Marketer(s); (k) or any other act or omission of Jobber, its Jobber-Marketers, any other customers of Jobber, or any of Jobber's -- or a Jobber-Marketer's -- agents, employees, contractors, invitees, licensees, or business associates, except such as may be due to the negligence of Company. Notwithstanding the above, Jobber agrees that the defense obligation included in this paragraph 14 will be immediate and ongoing, regardless of any ultimate allocation of negligence or other form of liability.

### 15. Insurance.

(a) **Types of coverage required.** Jobber will purchase and maintain at all times insurance covering all business operations related to this Contract. Specifically, Jobber will obtain and maintain, at its sole cost and expense, insurance coverage through an insurer, and in a form acceptable to Company, as follows: (1) Commercial general liability insurance of not less than $2,000,000 per occurrence, including coverage for contractual liability, bodily injury, property damage, fire liability, premises and operations liability, products completed operations hazard liability, independent contractor's liability, garage keeper's liability, medical expense liability, liquor liability and personal and advertising injury; (2) Worker's compensation, as required by law, and employer's liability insurance of not less than $2,000,000 for each accident and disease; (3) Business automobile liability insurance, including coverage on all vehicles owned, hired or used in the performance of this Contract, of not less than $2,000,000 per occurrence. Jobber may comply with the stated coverage amounts using alternative methods, excluding self-insurance, but including the use of umbrella coverage.

(b) **Requirements for each type of coverage.** All insurance policies required under this Contract will: (1) name the Company as an additional insured, except Worker's compensation insurance; (2) include an endorsement containing an express waiver of any right of subrogation or other recovery, by Jobber or any insurance company, against Company; (3) include an endorsement stipulating that Jobber's insurance policies are primary to, not contributory with and not excess to any other policies or self-insurance; (4) provide that no policy will be materially changed, amended or canceled except after 30 days' written notice to Company; and (5) provide that Jobber will be solely responsible for the payment of any premium or assessment, with no recourse against Company.

(c) **Proof of coverage required.** Each time Jobber renews the insurance coverage required under this Contract, but no less than annually, and at any time requested by Company, Jobber will provide such proof of coverage as Company determines is necessary for verification purposes including, but not limited to certificates of insurance or copies of the policies themselves. If Jobber fails to provide acceptable proof of insurance, as determined by Company, then Company may, at its option and in addition to all other remedies available to it under this Contract or at law, after 10 days notice to Jobber, obtain coverage to protect Company's interests only and charge the cost of such coverage to Jobber.

(d) **Environmental coverage.** If required by any applicable law, Jobber must obtain environmental impairment coverage in the amount and of the type required by such law.

(e) **Indemnity not limited by insurance.** The existence or non-existence of any insurance as required by this Contract will not limit the Jobber's indemnity or other obligations under this Contract.

**16. Termination and Non-Renewal.**

(a) **Company's breach.** Jobber may terminate this Contract if Company fails to comply with any material provision of this Contract, upon 90 days prior written notice of such a failure: provided, however, that Jobber will provide Company with a reasonable opportunity to exert good faith efforts to carry out such provision.

(b) **Jobber's breach/PMPA.** Company may terminate this Contract and non-renew any franchise relationship in accordance with Title I of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq., as amended ("PMPA"), and/or other applicable federal, state and/or local laws of the same nature and effect. Company expressly reserves all of its rights under the PMPA and Jobber acknowledges and agrees that no omission by Company of any specific reference to any specific PMPA right will constitute a waiver of that right. In addition, Jobber agrees and acknowledges that Company's rights and remedies under the PMPA will be without prejudice to all other rights and remedies available to Company at law or in equity.

(c) **Procedures for termination and non-renewal by Company.** If Jobber fails to comply with any of the terms and conditions of this Contract and/or related agreements, including all attachments, schedules, appendices, and amendments attached to and incorporated in those agreements, or if any other ground for termination and/or non-renewal arises, Company may, at its election, terminate this Contract and/or non-renew any franchise relationship upon 90 days written notice (or upon less than 90 days notice as may be reasonable under a particular circumstance). In the case of a market withdrawal, as defined in the PMPA, Company may terminate this Contract and/or non-renew any franchise relationship upon 180 days written notice.

(d) **Physical or mental incapacity and death.** For purposes of emphasis and elaboration, but without limitation, it is acknowledged and agreed by and between Company and Jobber that the following will constitute grounds for termination of this Contract and non-renewal of any franchise relationship: death or continuous, severe physical or mental disability of at least 3 months duration of: (1) the owner of the business, if Jobber is a sole proprietorship; or (2) one of the partners, if Jobber is a partnership; or (3) one of the members, if Jobber is an LLC; or (4) the beneficial owner(s) of a majority of Jobber's voting stock, if Jobber is a corporation, unless the death or other incapacity of said beneficial owner(s) results in the contemporaneous transfer of a majority of said voting stock to an Immediate Family Member or Members, or to a Fellow Stakeholder or Stakeholders who is/are at least 21 years of age with at least 1 year of active management experience in the Jobber's business.

(e) **Failure to purchase minimum quantities of Products pursuant to Attachment A-1.** Jobber's failure to purchase the applicable, annual minimum volume set forth in Attachment A-1, will constitute grounds for termination of this Contract and nonrenewal of any franchise relationship.

(f) **Underlifting product.** Jobber's failure to purchase the applicable, annual Attachment A purchase requirement over any 12-month continuous period during the Contract term, or any pro rata portion thereof, will constitute grounds for termination of this Contract and nonrenewal of any franchise relationship.

(g) **Early termination.** Jobber may terminate this Contract prior to the end of its stated term by paying Company an early termination sum ("Early Termination Sum") that is calculated by adding the following 3 elements: (1) all financial obligations

under Jobber's accounts, aggregated and accrued up to and including the termination date; (2) the aggregated and unamortized portion of any and all loans and advances made, and incentive and re-image funds provided to, Jobber; and (3) an amount established by Company, in its sole discretion, determined by multiplying the then current Attachment A annual purchase commitment (as extrapolated from the termination date up to and including the date the Contract would have expired under paragraph 1 above) by either: (i) a per gallon formula comprised of the most recent 3 year average Jobber Buying Price (weighted by grade) from Jobber's Designated Terminals, minus the most recent 3 year average Platt's spot price (weighted by grade), plus the then current cost of primary transportation to Jobber's Designated Terminals, minus 1 cent per gallon; or by (ii) 2 cents per gallon, whichever is higher. Jobber agrees that Company's losses arising out of Jobber's early termination of the Contract would not be readily ascertainable and that the Early Termination Sum, as developed above, would represent a reasonable approximation of Company's losses in the event of such early termination. Jobber also agrees that Company's rights and remedies under the various provisions of this paragraph 16 will be without prejudice to all other rights and remedies available to Company in this Contract or at law or in equity, including but not limited to the right to actual, consequential damages caused by and/or related to Jobber's breach of this Contract or any provision therein.

(h) **Company's equitable remedies.** Jobber agrees that money damages may not be a sufficient remedy for its breach of this Contract and that, therefore, in addition to all remedies available at law, Company will be entitled to specific performance, injunctive relief, declaratory judgment and/or other equitable remedies, as appropriate. Jobber agrees to waive any requirement for the posting of any bond in connection with Company's effort to seek an equitable remedy.

**17. Deliveries.**
(a) **Company's right to limit delivery quantities.** Unless otherwise specified in the attachments, schedules, appendices or amendments to this Contract, deliveries of each Product hereunder will be in equal and ratable quantities, subject to weekly or daily pro rating or any seasonal adjustments. Company will not be obligated to deliver to Jobber in any given month more than an amount equal to 1/12 of the respective 12-month quantity for each such Product as set forth in the then current Attachment A. Should Jobber at any time or for any month order in quantities less than its pro rated monthly amount, Company will not be obligated to deliver the deficiency at any time. Should Jobber at any time or for any month require more than said pro rated amount, Company will have the right, at its option, to supply such excess requirement, but if Company supplies same it will not be obligated to do so again in the future.

(b) **Company's right to specify minimum delivery quantities.** Company will have the right to specify minimum delivery quantities and either refuse to make deliveries in quantities less than such minimums or, at Company's option, to charge extra for making such deliveries.

(c) **Changes in and at Jobber's Designated Terminals.** Company will have the right, at any time, to change Jobber's Designated Terminals and/or to limit the quantity of Products that Company will make available to Jobber at any of said terminals by pro rating the annual quantities on a monthly, weekly or daily basis. Company will also have the right to determine and designate the percentage of Jobber's Attachment A quantities that Company will make available to Jobber at Jobber's Designated Terminals.

(d) **Returned vapors.** Any petroleum product vapors that are redelivered to Company's terminals or other delivery points from Jobber's transport equipment in connection with the operation of any vapor recovery equipment or system, will become the property of Company without any accounting therefor by Company to Jobber.

**18. Determination of Quantities.** The quantities of Products sold hereunder will be determined on the basis of the temperature thereof at 60°F in accordance with "Table No. 6B of API Standard 2540, Manual of Petroleum Measurement Standards, Chapter 11.1--Volume Correction Factors--Volume II" (or any API/ASTM reissue or replacement thereof in effect at the time of measurement), or at Company's option, on the basis of gross volume, as established by Company for Jobber's class of trade in the applicable geographic area, or as otherwise required by law.

**19. Demurrage.** Jobber will pay any and all demurrage accruing on any barges, tank cars, transport and/or tank trucks or other means of transportation at the prevailing rates therefor, at the time of the particular delay. Jobber will also pay to Company a tank car and/or truck transport rental at Company's then prevailing rates for each chargeable demurrage day.

**20. Rejection of Products and Notice of Breach.**
(a) **Rejection must occur within 48 hours of receipt.** Jobber will have 48 hours after its receipt of the Products sold under the Contract to inspect and either accept or reject said Products.

(b) **Required procedures if Products rejected.** If Jobber intends to reject, it must do so in writing within the 48 hour inspection period and Company must receive said notice within 5 business days of Jobber's receipt of the Products in question. If Jobber fails to timely reject or fails to specify a claimed shortage, defect or nonconformity, said failure will constitute an irrevocable acceptance of the Products in question and/or a waiver of the alleged shortage, defect or nonconformity.

(c) **Required procedures if breach discovered after acceptance.** In the event that the Products are accepted pursuant to the terms of this paragraph 20, Jobber agrees to notify Company in writing of any subsequently discovered breach of warranty which could not have reasonably been discovered by careful inspection at the time of delivery. Such notice will be given within 7 days after discovery of the breach and must specify the facts constituting the alleged breach. Failure to give such notice will be deemed conclusive evidence that Jobber has no valid claim for breach of warranty.

### 21. Express Warranties, Disclaimers and Damage Limits.
(a) **Company warranties.** Company warrants that the Products sold to Jobber under this Contract will meet Company's then current specifications for the respective Product and that said Product will be in merchantable condition.

(b) NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, ARE MADE.

(c) **Right to damages limited.** Under no circumstances will Company be liable for incidental, special, punitive or consequential damages whether under warranty, tort, contract, strict liability or otherwise.

### 22. Force Majeure and Allocation.
(a) **Force majeure.** Company will be excused from delay or nonperformance in the event of a refinery turnaround, whether partial or complete, or if it is otherwise unable to meet the demand for its Products at Company's normal and usual distribution points for supplying Jobber (regardless of whether or not Company may have diverted certain supplies from such distribution points in order to alleviate shortages at other distribution points), or in the event of failure or delay in delivery due to exhaustion, reduction or unavailability of Product, or an element, item or component necessary in the manufacture, production, or delivery of such Product. Either party will be excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control, including without limitation: unavailability, failure, or delay of transportation; "Acts of God"; labor difficulties; explosions; storms; breakdown of machinery or equipment; fire; riots; war conditions in this or any other country; and compliance with any law or governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary) affecting directly or indirectly said party's ability to perform hereunder.

(b) **Allocation.** In the event of any of the contingencies or conditions referred to in paragraph 22(a) above, Company will have the right to curtail deliveries or allocate its supply of Product for sale among its customers in any manner that it deems to be fair and reasonable under the circumstances, and will not be obligated to obtain or purchase other supplies of Product or in any way make up for any Product not delivered. Jobber will not hold Company responsible in any manner for any losses or damages which Jobber may claim as a result of any such curtailment or allocation by Company.

### 23. Discontinuance of Products or services.
Company may at any time and for any reason: (a) discontinue the production or sale of any Product covered hereby; (b) change the specifications or grade of any such Product; (c) replace any such Product with another Product; (d) change or withdraw the Trade Identities applicable to any such Product; (e) change or withdraw services, equipment or facilities offered in connection with any such Product, including but not limited to Payment Methods services or privileges; and/or (f) withdraw from marketing any such Product in the trade area encompassing any Approved Retail Site and/or in which Jobber's bulk plants or any of Jobber's Designated Terminals are located. Company will not be liable to Jobber by reason of any such discontinuance, replacement, change or withdrawal.

### 24. Compliance with Laws.
(a) **Compliance with laws generally.** Jobber will comply, and require its Jobber-Marketers and other customers to comply, with any and all applicable laws and regulations of any and all governmental authorities regarding the receipt, shipment, delivery, storage, handling, use, sale, dispensing, measuring, calibrating, labeling, invoicing, advertising and/or promoting of the Products purchased under this Contract.

(b) **Compliance with environmental laws.** Without limiting the foregoing, Jobber will comply, and require its Jobber-Marketers and other customers to comply, with any and all applicable laws and regulations promulgated by any and all governmental occupational, health and safety agencies and/or environmental protection agencies, including but not limited to: (1) the following federal Clean Air Act regulations and any corresponding state counterparts, as amended from time to time: (i) 40 CFR. Part 80, Subpart D, regarding reformulated gasoline; (ii) 40 CFR. Part 80, Subpart C, regarding oxygenated gasoline; (iii) 40 CFR. Part 80, Subpart B (specifically 40 C.F.R. sections 80.27 and 80.28), regarding gasoline volatility; (iv) 40 CFR. Part 80, Subpart B (specifically 40 C.F.R. sections 80.29 and 80.30), regarding sulfur content in diesel fuel; and (v) 40 C.F.R. Part 80, Subpart G, regarding deposit control additives in gasoline; (2) the Resource Conservation and Recovery Act, as amended, 42 USC Section 6901 et seq.; (3) the Clean Water Act, as amended, 33 USC Section 1251 et seq. ; and (4) the Safe Drinking Water Act, as amended, 42 USC Section 300f et seq.

(c) **Compliance with weights and measures laws.** Without limiting the foregoing, Jobber will comply, and require its Jobber-Marketers and other customers to comply, with any and all applicable weights and measures laws and regulations promulgated by any and all governmental authorities. In addition, Jobber will develop and maintain a program designed to assure and monitor compliance with any and all applicable weights and measures laws and regulations for each of its Approved Retail Sites, including its Jobber-Marketer Approved Retail Sites.

(d) **Company's right to monitor compliance.** As part of Company's compliance programs, Jobber acknowledges and agrees that Company will have the right to enter upon any premises, including any Approved Retail Site, in or upon which any records necessary to demonstrate Jobber's compliance with the obligations referred to in paragraphs 24(a), 24(b) and 24(c) above are kept. Jobber also grants to Company the right to obtain and/or copy any records, inspect any equipment and sample any Products covered by this Contract.

**25. Taxes.** Jobber will pay, or will reimburse Company for Company's payment of, any tax, inspection or environmental fee, duty, tariff or other like charge (including penalty and interest, if any) imposed, levied, or assessed by federal, state, local, Native American, or foreign authority upon the Products or transactions covered by this Contract, or upon the import, manufacture, storage, sale, use, transportation, delivery, or export of the Products covered by this Contract, or upon the privilege of doing any of these activities, whether imposed on or measured by the volume, price, or proceeds of sale of the Products covered by this Contract.

**26. Confidentiality.** Jobber acknowledges and agrees that the guidelines, manuals, methods, policies, procedures, programs, software, specifications, standards (both operational and visual), strategies and all related information provided by, or on behalf of, Company are proprietary and confidential (individually and collectively, "Confidential Information"). Accordingly, Jobber will not disclose any Confidential Information to third parties or use it for any purpose not authorized by Company, unless otherwise required by law. In addition, Jobber may only disclose Confidential Information to its employees and its Jobber-Marketers on a 'need to know' basis and only then if Jobber, its employees and its Jobber-Marketers undertake to keep said disclosures confidential.

**27. Notices.** All notices given under this Contract will be deemed properly served if delivered in writing personally or sent by certified mail (return receipt requested) to Company or Jobber at the addresses indicated in the introduction to this Contract. The date of notice will be the date deposited in the U.S. mail or, if delivered personally, the date of delivery. Any change of address of a party will be communicated to the other party by written notice in accordance with the terms of this paragraph 27.

**28. Entire Agreement.** This Contract cancels and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments and understandings between the parties pertaining to the matters covered in this Contract, except any indebtedness owed to Company, and contains the entire agreement between the parties. No representations or statements, other than those expressly set forth in this Contract were relied upon by the parties in entering into this Contract. No amendment, modification or waiver of, addition to, or deletion from the terms of this Contract will be effective unless reduced to writing and signed by Jobber and a Company representative with actual authority to bind the Company, including a regional marketing vice president ("RVP"), or successor position, or other authorized Company representative with equal or superior authority.

**29. Severability.** In the event one or more paragraphs of this Contract, or portions of any paragraph, are declared or adjudged invalid or void by a court of competent jurisdiction, the remaining paragraphs of this Contract, or remaining portions of any paragraph, will remain in full force and affect. Company may, in the alternative and at its sole discretion, cancel this Contract with due notice to Jobber.

**30. No Waiver.** No course of dealing and no failure to act on any incident of breach under this Contract will be construed against Company as a waiver of its right to act in the future. The waiver of any breach of any term or condition in this Contract will not be construed as a waiver of any subsequent breach of the same or any other term or condition. Any failure by Company to enforce its rights or to seek remedies for any breach of this Contract will not prejudice its rights or available remedies for any subsequent breach by Jobber.

**31. Paragraph Titles.** The titles and subtitles of paragraphs in this Contract are for reference and identification purposes only. They are not intended to modify, restrict or expand upon the content of the paragraphs themselves.

**32. Capitalized Terms/Definitions.** Capitalized terms in the Contract will be defined and have the meanings as set forth herein.

**33. Execution.** This Contract will not be binding upon Company unless and until it is signed by Jobber and a Company representative with actual authority to bind the Company, including an RVP, or successor position, or other authorized Company representative, and a fully executed copy is returned to Jobber. The signatures of authorized individuals from both Amoco Oil Company and BP Exploration & Oil, Inc. will be required to bind both companies.

**In Witness Whereof,** the parties hereto have executed this Contract on the date stated.

Jobber:    Armada Oil & Gas Co., Inc

By:

    Printed Name:    Allie Berry

Title:    Vice-President

☐ Amoco Oil Company

By:

Title:

and/or, as the case may be,

☒ BP Exploration & Oil, Inc.

By:

Title:    John A Soard, Jobber Sales Manger

with such entity designated by an "x" before its name



bp

Trade Signage Agreement
(Jobber)
BJ.CTR-SIGNS (9-2000)

This trade signage agreement ("Trade Signage Agreement") is executed simultaneously with and hereby made a part of the current branded jobber contract ("Contract") dated **April 10, 2001** by and between Amoco Oil Company, a Maryland corporation, or its successor, and/or, as the case may be, BP Exploration & Oil, Inc., an Ohio corporation, or its successor (hereinafter referred to as "Company"), and **Armada Oil & Gas Co., Inc** ("Jobber")

(State exact legal name of Jobber)

**Now, Therefore,** Company and Jobber, intending to be legally bound, agree to the following:

**1. Jobber's acquisition of Trade Identity Signage.** Jobber is engaged in the advertising, distribution and/or resale of branded Products (as defined in the Contract) authorized by, supplied by and/or purchased from Company under the above-referenced Contract. Accordingly, Jobber has purchased or otherwise acquired and/or intends to purchase or otherwise acquire, approved advertising signs and related materials bearing or consisting of Company's Trade Identities (as defined in Contract) which signs (hereinafter referred to as "Trade Identity Signage") which Jobber has installed or intends to install at each Approved Retail Site (as defined in the Contract).

**2. Use of Trade Identity Signage generally.** Jobber will be permitted to display, and will be permitted to allow its Jobber-Marketers (as defined in the Contract) to display – on a non-exclusive, limited, site specific basis at its Approved Retail Sites – Trade Identity Signage in connection with the advertising, distribution and/or resale of the Products authorized by, supplied by and/or purchased from Company under said Contract.

**3. Use of Trade Identity Signage governed by the Contract, this Trade Signage Agreement and related agreements.** The permission to display Trade Identity Signage will be governed by and subject to the terms and conditions of the Contract (including paragraph 6(a) therein), this Trade Signage Agreement and all related contracts, including all attachments, schedules, appendices, and amendments attached to and incorporated in those agreements. In addition, Trade Identity Signage will only be installed and/or displayed in accordance with the guidelines, policies, procedures, requirements, specifications and standards (both operational and visual) issued by Company, as amended from time to time. Company will retain, at all times, the right to determine what Trade Identity Signage will be used or displayed, and the manner of its use or display, at an Approved Retail Site and the right to restrict the use or display of certain Trade Identity Signage to certain Approved Retail Sites (or to certain locations at an Approved Retail Site).

**4. Jobber to provide list of Trade Identity Signage with exact location(s).** Jobber will provide Company with a list of all Trade Identity Signage in Jobber's possession and/or control and the exact location of the Trade Identity Signage, upon Company's request. Under no circumstances will Jobber be allowed to relocate Trade Identity Signage to another Approved Retail Site or other retail location without Company's consent.

**5. Use of Trade Identity Signage in conjunction with the sale of Representative Amounts of certain Products.** At all times and at each Approved Retail Site where Trade Identity Signage is displayed, including Jobber-Marketer sites, Jobber will offer for sale, or cause to be offered for sale, Representative Amounts (as defined in the Contract) of each grade of Company-branded Product. If Jobber ceases to offer or make available one or more of these Products in the required Representative Amounts at an Approved Retail Site supplied by Jobber, Jobber will cease using or displaying, or cause its Jobber-Marketer to cease using or displaying, Trade Identity Signage at that site.

**6. Use of Trade Identity Signage in conjunction with Company's retail marketing strategies and development plans, image programs and standards.** Jobber's right to use and display Trade Identity Signage will also be subject to Company's then current image programs and standards (both operational and visual), as amended from time to time, and Company's then current retail marketing strategies and development plans, as amended from time to time. If an Approved Retail Site no longer conforms or fails to conform to Company's image programs or standards (both operational and visual), or its retail marketing strategies and development plans, Company may revoke its prior approval identifying the Approved Retail Site, as further provided in paragraph 6(b) of the Contract, in which case Jobber will cease using or displaying, or cause its Jobber-Marketer to cease using or displaying, Trade Identity Signage at that site. Company will also have the right, at any time and for any reason, to revoke its prior approval to use certain or all of its Trade Identities at certain or all Approved Retail Sites (or at certain locations at an Approved Retail Site) and, where applicable and in its sole discretion, to substitute any other Trade Identities in their place. In which case, Jobber will cease using or displaying, or cause its Jobber-Marketers to cease using or displaying, the corresponding Trade Identity Signage in

question. Jobber agrees and acknowledges that Company's image programs and standards (both operational and visual) will include those programs and standards for the design, construction, maintenance, appearance and cleanliness of the Approved Retail Sites at which the Trade Identity Signage is installed and displayed.

**7. Misuse of Trade Identity Signage in connection with certain sales.** Jobber will not use any Trade Identity Signage in connection with the advertising, distribution and/or resale of: any dilution or adulteration of a Product authorized by, supplied by and/or purchased from Company; any mixture or blend of Products authorized by, supplied by and/or purchased from Company, without Company's prior written consent (which consent may be revoked at any time and for any reason); any Product authorized by, supplied by and/or purchased from Company but sold under an incorrect or inappropriate Mark or through unapproved or disapproved packages, containers or equipment; or any product not authorized by, supplied by and/or purchased from Company.

**8. Removal and/or discontinued use of Trade Identity Signage.** Company will have the right to cause any and all Trade Identity Signage to be removed, covered or obliterated, and the right to cause the Trade Identities on said Trade Identity Signage to be removed, covered or obliterated, from any Approved Retail Site (or from certain locations at an Approved Retail Site): found to be in violation of any provision of the Contract or this Trade Signage Agreement; disapproved in accordance with paragraph 6(a) of the Contract; or at which approval has been revoked in accordance with paragraph 6(b) of the Contract. Likewise, upon the expiration or termination of the Contract for any reason, Jobber will immediately cease using or displaying, and cause its Jobber-Marketers to cease using or displaying, all Trade Identity Signage in its possession or control. Jobber will also immediately remove, cover or obliterate or, where appropriate, cause any third party to immediately remove, cover or obliterate all Trade Identity Signage on any personal property sold or transferred by Jobber or its Jobber-Marketers.

**9. Company's right to remove Trade Identity Signage.** If, within 10 days after Company's written request, Jobber fails to cease using or displaying the Trade Identity Signage or fails to remove, cover or obliterate said Trade Identity Signage, or fails to cause its Jobber-Marketer(s) to do the same, Company will have the irrevocable right to use any means necessary to remove, cover or obliterate said Trade Identity Signage, or the Marks thereon, including entering onto the premises upon which the Trade Identity Signage is located or filing a legal action, with Jobber's full and complete cooperation and at Jobber's expense. Jobber will not directly or indirectly cause any Trade Identity Signage to become fixtures or part of the real property upon which the Trade Identity Signage may be used or displayed. No action taken by Company in accordance with this paragraph 9 will be construed as an exercise of Company's option to purchase any Trade Identity Signage.

**10. Company's right to purchase Trade Identity Signage via purchase option.** Company will have the option, but not the obligation, at any time and for any reason to purchase any and all Trade Identity Signage owned by Jobber, on the basis of a depreciated cost determined by the period of Jobber's ownership and beginning with the date of Jobber's purchase. The date upon which the Trade Identity Signage is placed in Company's possession will also be used to compute the period of Jobber's ownership. Company will initiate its option by providing Jobber with a list of the Trade Identity Signage it desires to purchase, along with a request for proof of purchase. Within 10 days of receiving Company's list, Jobber will provide Company with the requisite proof of purchase in a form or forms satisfactory to Company. Within 10 days of receiving satisfactory proof of purchase, Company may exercise its option to purchase the Trade Identity Signage by providing Jobber with written notice. In the event Company exercises its option under this paragraph 10, Jobber agrees to do all things necessary to place Company in full ownership and possession of the Trade Identity Signage, within 30 days of Company's notice. Pursuant to this paragraph 10, Company agrees to pay Jobber for the Trade Identity Signage as follows:

| | |
|---|---|
| During the first year of ownership . . . . . . . . . . . . . .100% of Jobber's purchase price | |
| During the second year of ownership . . . . . . . . . . . . 90% of Jobber's purchase price | |
| During the third year of ownership. . . . . . . . . . . . . . 80% of Jobber's purchase price | |
| During the fourth year of ownership . . . . . . . . . . . . . 70% of Jobber's purchase price | |
| During the fifth year of ownership . . . . . . . . . . . . . . 60% of Jobber's purchase price | |
| During the sixth year of ownership . . . . . . . . . . . . . 50% of Jobber's purchase price | |
| During the seventh year of ownership. . . . . . . . . . . . 40% of Jobber's purchase price | |
| During the eighth year of ownership . . . . . . . . . . . . 30% of Jobber's purchase price | |
| After the eighth year of ownership. . . . . . . . . . . . . . 25% of Jobber's purchase price | |

**11. Company's right to terminate Trade Identity Signage lease or rental agreement.** Company will have the right to terminate any Trade Identity Signage lease or rental agreement at any time and for any reason and to take possession of any and all Trade Identity Signage leased, rented or otherwise provided thereunder. Company may exercise its right to terminate under this paragraph 11 by providing Jobber with written notice. In the event Company does terminate, Jobber agrees to do all things necessary to place Company in full possession of the Trade Identity Signage, within 30 days of Company's notice.

12. **Sale of Trade Identity Signage by Jobber requires Company's consent.** Jobber agrees not to sell, assign, transfer or otherwise dispose of, or permit the use or display of, any Trade Identity Signage without the prior written consent of Company in each case. In the event Jobber negotiates with any third party for the sale, lease, encumbrance or other disposition of the premises upon which any Trade Identity Signage is located. Jobber will, prior to the completion of such negotiations or execution of any contract, inform said third party of the terms and conditions of this Trade Signage Agreement and provide Company with written proof of such notification.

13. **Maintenance and repair of Trade Identity Signage.** The maintenance and repair of any and all Trade Identity Signage will be the responsibility of Jobber. Jobber also agrees to keep said Trade Identity Signage in good repair and condition at all times and to maintain any and all licenses and/or permits which may be required as a condition to its installation, use or display.

14. **Notices.** All notices under this Trade Signage Agreement will be given in accordance with paragraph 27 of the Contract.

15. **This Trade Signage Agreement supersedes all prior agreements.** This Trade Signage Agreement will cancel and supersede any and all prior Trade Signage Agreements. In the event of any conflict between this Trade Signage Agreement and any Trade Identity Signage lease or rental agreement between Company and Jobber, the terms and conditions of this Trade Signage Agreement will apply.

**In Witness Whereof,** the parties hereto have executed this Trade Signage Agreement on the date stated.

Jobber:      Armada Oil & Gas Co., Inc

By: _____

    Printed Name:      Allie Berry

Title:      Vice President

☐ Amoco Oil Company

By: _____

Title: _____

and/or, as the case may be.

☒ BP Exploration & Oil, Inc.

By: _____

Title:      John A Soard, Jobber Sales Manger

with such entity designated by an "x" before its name

# EXHIBIT 2





**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Thu Sep 29 04:12:48 EDT 2005*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At:          OR  Jump  to record:     **Record 67 out of 356**

TARR Status  ASSIGN Status  TDR Status  TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| Word Mark | BP |
|---|---|
| Goods and Services | IC 004. US 001 006 015. G & S: Industrial oils and greases, fuels namely gasoline and diesel fuel, non-chemical additives for oils and fuels; automotive lubricants and lubricating greases for vehicles. FIRST USE: 20001229. FIRST USE IN COMMERCE: 20001229 |
| | IC 035. US 100 101 102. G & S: providing photocopy services; retail store services featuring convenience store and gasoline; beverage vending machine service; retail gasoline supply services; retail distributorship services featuring fuel, oil, petroleum, gas and lubricants and grocery store services. FIRST USE: 20001229. FIRST USE IN COMMERCE: 20001229 |
| | IC 037. US 100 103 106. G & S: Anti-rust treatment for vehicles; land vehicle cleaning, polishing, greasing, lubrication, maintenance and repair, motor vehicle wash; vehicle tire refitting and repair; vehicle service stations and vehicle fueling service station. FIRST USE: 20001229. FIRST USE IN COMMERCE: 20001229 |
| | IC 042. US 100 101. G & S: Cafe; cafeteria; canteen; catering; restaurant and snack bar services; take-away food services. FIRST USE: 20001229. FIRST USE IN COMMERCE: 20001229 |
| | IC 038. US 100 101 104. G & S: providing Internet access via kiosks. FIRST USE: 20010109. FIRST USE IN COMMERCE: 20010109 |
| Mark Drawing Code | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| Design Search Code | 070306 |

| | |
|---|---|
| Serial Number | 76243740 |
| Filing Date | April 23, 2001 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | August 10, 2004 |
| Registration Number | 2898527 |
| Registration Date | November 2, 2004 |
| Owner | (REGISTRANT) BP p.l.c. LTD LIAB CO UNITED KINGDOM 1 ST. JAMES'S SQUARE LONDON SW1Y 4PD, ENGLAND UNITED KINGDOM |
| Assignment Recorded | ASSIGNMENT RECORDED |
| Attorney of Record | Donald C. Knapp, Jr. |
| Prior Registrations | 0882655;0928078;0928128;1017260;1025891;1789649;1801072;1834140;1854364; 1937682;2394622;2441720;2548648;2554697;2570486;2570504;2669921;AND OTHERS |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE the configuration of the building, the support columns, the gas pump nozzles and hoses, and the color white APART FROM THE MARK AS SHOWN |
| Description of Mark | The mark consists of the letters "BP" and the design of a Helios as applied to external signage and structures of the service stations at which the services are rendered. The mark also consists of the configuration of the station where the goods and services are offered. consisting of white horizontally-lined column posts, curved gas pumps, and the colors yellow and green as applied to the exterior surface of the buildings, canopy, pole signs, panels above/below the pumps, as well as on signage at the station. The drawing is lined for the colors yellow and green, and the colors yellow and green are claimed as features of the mark. |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL-2(F) |
| Live/Dead Indicator | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 3





**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Thu Sep 29 04:12:48 EDT 2005*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: _____  OR  Jump  to record: **Record 61 out of 356**

TARR Status  ASSIGN Status  TDR Status  TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | **BP** |
| **Goods and Services** | IC 001. US 001 005 006 010 026 046. G & S: chemicals, namely, chemicals for use in the manufacture of pharmaceuticals, cosmetics, detergents, packaging, wire and cable installation, cassette tapes, synthetic rubber, paints and coatings, adhesives, fuel additives, lubricants, textiles, agriculture, electrical and electronic components, automotive parts, building and construction, plastics, foods and diagnostic equipment; unprocessed artificial and synthetic resins for use in the manufacture of fibers, polymers and coatings; plastic molding compounds for use in the manufacture of molded plastic articles, plastic sheets and plastic films; chemical products for use in machining and metal working operations and in the treatment of cooling systems, namely, coolants for vehicle engines and cutting tools; solvents as additives for use in the manufacture of a wide variety of goods; solvent type processing compositions for use in the electronics industry; chemical solvents for use in heavy industrial and marine vessel cleaning, wax and plugging solvents for use in the manufacture of petroleum and heat transfer fluids; hydraulic fluids for general use; detergents and degreasing preparations for use in industry and manufacturing processes, namely, industrial detergent preparations for use in cleaning machines during manufacture of goods and degreasing preparations used on machines and parts thereof during the manufacture of goods; detergent additive for use with motor oil; surfactants for use in the manufacture of synthetic detergents; releasing agents, namely, mold release compounds for use in a wide variety of industries; chemical preparations for use in the removal of lime, scum, scale, mortar, oil, grease, wax, ink, carbon, dirt, mildew, mold, grime and stains. emulsifiers for use in the manufacture of foods, leather, textiles, coatings, oils and coolants; chemical preparations for inhibiting rust on metals; brake fluid; chemical preparations for use in the detection of surface blemishes, flaws and cracks in relation to metal; diagnostic and analytical preparations, namely, diagnostic preparations for scientific or research use; chemical preparations, namely, dispersants for the dispersal of oil, grease and petroleum; chemical preparations for preventing scale for non-household purposes; chemical products for preserving foodstuffs; catalysts for use in the manufacture of industrial chemicals, petroleum rack, and for use in the oil processing |

industries; drilling muds for use in oil well drilling; anti-freezing and de-icing preparations for melting snow and ice, and to prevent engines and engine parts from freezing; chemical additives for fuels and lubricants, namely chemical additives for motor oil, chemical gasoline additives; chemical additives for fuel treatment, chemical additives for use with internal combustion engine fuels, fuel injection cleaner chemical additives, octane booster fuel chemical additives; molding compounds, namely, plastic molding compounds for use in plastic extrusion operations; plastic molding compounds for use in the manufacture of molded plastic articles; plastic molding compounds for use in the manufacture of plastic sheets and films; polymer beads for use in manufacturing; liquid polymers for use in the manufacture of sealing and caulking products; engineering thermoplastics in the nature of recyclable olefin polymers for general use in the manufacture of goods; silicon and silicates for use in the manufacture of building materials, electronics, and alloys; agglutinants for cements. photographic film, namely, sensitized and unexposed; chemical additives for oil well drilling fluids; transmission fluid.

IC 002. US 006 011 016. G & S: anti-corrosive preparations and substances, namely, corrosion inhibiting paint type coatings for use in the oil and gas drilling industry; anti-rust oils and greases; rust preservatives in the nature of a coating; agglutinants for paints and for putty; interior and exterior paints; varnishes, lacquers in the nature of a coating, coatings in the nature of paints, sprays or oils for decorating use, preserving against rust, preventing staining, protection against corrosion, waterproofing and weatherproofing, and sealants, namely, sealer coatings for use in the manufacture of products; colorants for use in the manufacture of beverages, cosmetics, food, paint, paper, plastic molding compounds, printing ink and soap; enamels for painting; mordants for leather and wood; color pigments; preparations for undercoating and undersealing vehicle chassis; metals in powder form for painters, decorators, and artists; natural resins for use in the coating and manufacture of plastics; thickeners, thinners and color pigments all for paints, varnishes and lacquers; wood preserving oils.

IC 003. US 001 004 006 050 051 052. G & S: paint, lacquer and varnish removing preparations; detergents and de-greasing liquids and preparations, excluding use in industrial and manufacturing processes or for medical purposes, namely, automatic dishwashing, dish and laundry detergents; cleaning, polishing, scouring and abrasive preparations, namely, all purpose cleaning preparations, floor polish, chrome polish and general purpose scouring powder; soaps, namely disinfectant soaps and liquid soaps for hands, face and body; hair lotions; perfume; hair gels and eye gels and hairsprays; shampoos, namely baby, carpet and hair; essential oils for personal use; cosmetics; dentifrices; toothpaste; shoe polish; essential oils for food flavorings; depilatories; deodorants for personal use; skin whitening creams; cotton balls for cosmetic purposes; cleansing moisturizing milk; false nails; false eyelashes; adhesives for false eyelashes, hair and nails; hair waving preparations in the nature of hair waving lotions; cosmetic kits consisting primarily of makeup, eyebrow pencils; lipsticks; sachets for perfuming clothing and linen; mouthwashes, not for medical purposes; shaving preparations; scale removing preparations for household purposes; stain removers; sun tanning preparations; sunscreen preparations; talcum powder; windscreen cleaning preparations; waxes, namely, floor wax and automobile wax; petroleum jelly for cosmetic purposes; sandpaper; abrasive cloth; chemical preparations for inhibiting rust, namely, rust removing preparations.

IC 004. US 001 006 015. G & S: industrial oils; greases, namely automotive grease, grease for machines and general purpose grease; fuels, namely, gasoline, diesel, natural gas and liquid gas, oil used as a fuel for industrial or domestic use; candles and illuminating grease for machines; non-chemical additives for gasoline, diesel and oils; lubricants and lubricating greases; namely, all purpose lubricants, lubricants for industrial machinery and automotive engine lubricants; metal working products having lubricating properties, namely, cutting oil for industrial metal working; engine oils, gear oils, automotive final drive oils; carnauba wax; petroleum jelly for industrial purposes; preparations, fluids and oils for machining and/or metal working operations, namely, cutting oil for industrial metal working, mineral oil for use in the manufacture of metal cutting fluids.

IC 005. US 006 018 044 046 051 052. G & S: disinfectants, namely, all purpose, for chemical toilets, contact lenses, medical instruments and hygiene purposes; antiseptics; preparations for killing weeds and destroying vermin; insecticides for agricultural and domestic use; general purpose germicides; additives to fodder or drinking water for medical purposes, namely, medicated animal feed and medicated animal drinking water; bandages, namely, adhesive, surgical and skin wound; medical sticking plasters; over the counter medicines, namely, medicines for treating headaches, stomach upsets, indigestion, sore throats, diarrhea, stress, insomnia, mouth ulcers, toothache, skin irritation, colds and flu; disinfecting detergents for medical purposes; greases and petroleum jelly for medical or veterinary purposes; non-electric insect repellants; air fresheners for motor vehicles and rooms; diagnostic and analytical preparations, namely, diagnostic preparations for clinical or medical

laboratory use; medicated shampoos.

IC 006. US 002 012 013 014 023 025 050. G & S: array frames for solar cells and modules made wholly or principally of metal; containers of metal for lubricants, oils, greases, chemicals, compressed gases and liquid fuel; metal pipes; manually operated metal valves not being parts of machines; metal key rings and key rings with fobs; aluminum foil; oil cans and drums for household and kitchen purposes sold empty made wholly or principally of metal; metal barrels; fluid storage tanks made wholly or principally of metal; metal gas storage tanks.

IC 007. US 013 019 021 023 031 034 035. G & S: pumps, namely, gasoline, oil or water pumps for use in motors and engines, sump pumps, central fugal pumps, positive displacement pumps, rotary pumps, suction pumps and vacuum pumps; compressors, namely, air compressors, refrigerators and compressors for machines; ignition parts for internal combustion engines; namely, condensers; generators, namely, electronic and for land vehicles; drilling machines, namely, drilling rigs; filters, namely, oil, gas or air filters for motors, engines and machines; machines for exhaustion, transportation, generation and preparation of gases; ore treating machines; pump diaphragms; speed governors for machine engines and motors; turbines other than for land vehicles, namely, hydraulic and wind turbines; vehicle washing machines; tire vulcanisers; booms used in the recovery and towing of disabled land vehicles; derricks; mechanical loading ramps; fuel economizers for motors and engines; radiator caps; radiators for motors and engines; dynamos; fan belts for motors and engines; photovoltaic apparatus and installations for generating solar electricity, namely, electric generators; steam radiators for vehicles.

IC 009. US 021 023 026 036 038. G & S: surveying apparatus and instruments, namely, surveyors levels, surveyors chains, measuring apparatus and instruments used by surveyors to survey land; measuring apparatus and instruments, namely, ohmmeters, wave meters, altimeters, alcoholmeters, ammeters, dynamometers, ergometers, frequency meters, galvanometers, gasometers, hydrometers, inclinometers, lactometers, manometers, planimeters, polarimeters, pressure gauges, protractors, pyrometers, refractometers, saccharometers, salinometers, scales, speed indicators, spherometers, tachometers, telemeters, variometers, volimeters; photographic apparatus and instruments, namely, photographic cameras; fire extinguishers; power cables; electrical photovoltaic cells and batteries; battery charger and electric accumulators; acid hydrometers; acid meters for batteries; anode batteries; anodes; capacitors; circuit breakers and circuit closers; clothing for protection against accidents and/or fire, namely, protective gloves, helmets and coats; coin operated electric gates for car parks or parking lots; computers; blank magnetic and optical disks; galvanic batteries; magnetically encoded identity cards; magnetically encoded cards for electronic, optical or magnetic storage of data for use as customer loyalty cards; smart cards, namely, blank, encoded, electronic, chipped or integrated circuit smart cards; magnetically encoded card readers and encoders, automated teller and card reading machines; authorization cards, charge cards and personal identification cards, namely, magnetically encoded authorization cards, charge cards and personal identification cards; electric controllers for remote ignition of furnaces and other fuel burning appliances; integrated circuits; lifejackets; life saving rafts; children's floatation aids, namely, life buoys; oscillographs; printed circuits; pyrometers; solar batteries; telemeters; temperature indicators, namely, thermometers, temperature indicators for use with engines and machines; electric theft prevention burglar alarms; silicon wafers; water level indicators for scientific measuring and swimming pools. computer software for data processing, for dynamic simulation of oil well drilling, for establishing pump operating schedules, for financial reporting, for managing conferences, for use as a spreadsheet, for word processing; downloadable electronic publications in the nature of newsletters and magazines in the fields of chemicals. petroleum, gas, engineering, solar energy and exploration; automatic and coin operated amusement machines, namely, slot machines; sunglasses; spectacle chains; disposable photographic cameras; fuel dispensing pumps for service stations; blank audio tapes; blank magnetic computer tapes; electric light emitting signs; tire pressure measuring gauge; radios; electric plugs; plug adapters; speed indicators, namely, speedometers; vehicle breakdown warning triangles; pumps, namely, metered gasoline pumps; centrifugal metering pumps; fuel pumps for service stations; condensers; photovoltaic solar electric installations, namely, electric generators and solar collectors for use in telecommunications, navigational aids, cathodic protection, lighting and rural electrification; exposed photographic film.

IC 011. US 013 021 023 031 034. G & S: installations and apparatus for lighting, heating. cooking, refrigerating, drying, ventilating, air conditioning, water supply, sanitary purposes, gas separation, gas storage, waste destruction or disposal, namely, water filtering apparatus, water flushing installations, water heaters, water purification apparatus for machines, water softening apparatus and installations,

sanitary fixtures, namely, urinal fixtures, toilets, ceiling lights, electric lamps, gas lamps, light bulbs, lights for vehicles, electric solar and gas heating installations and apparatus, domestic ovens and microwave ovens for cooking, refrigerators, freezers, industrial dryers for heating and dehumidifying and clothes dryers, air conditioners; separators for the cleaning and purification of gases; incinerators; heat accumulators, namely, solar heating collection panels; cooling and freezing apparatus, namely, evaporative air cooling units for domestic use, freezers for domestic or industrial use; electrical and steam central heating radiators; electric light bulbs; lamps and discharge tubes for lighting; electrically operated insect repellants; distillation apparatus and columns, namely, water distillation units; dust exhausting and removing installations, namely air purifying units for industrial purposes; flare stacks for use in release of gases; flues for use in carrying off smoke and gases; fuel economizers, namely, apparatus for measuring and regulating the consumption of fuel in home, factories and offices; gas burners for industrial, commercial and domestic use; germicidal gas burners; heat exchangers; heat pumps; petrol burners; radiators, namely, electric and steam radiators for heating buildings; solar collectors for heating; solar furnaces; electric torch lights; plumbing fittings, namely, level controlling valves for use in tanks. air-freshening dispensing units for automobiles, aircraft and boats; pumps, namely, heat pumps; steam generators; exhausts other than for land vehicles, namely, exhaust hoods for kitchens; filtering machines, namely, filtering units for water filtering units for producing potable water for domestic use and filtering units for engines and machines; heat exchangers; photovoltaic solar electric installations, namely, solar collectors for use in telecommunications, navigational aids, cathodic protection, lighting and for rural electrification; filaments for electric lamps.

IC 012. US 019 021 023 031 035 044. G & S: land vehicle parts and accessories thereof. namely, wheels, hub caps. tires, inner tubes, tire valves, air brake hoses, exhaust pipes, engine or motor silencers, electric starter motors, brake linings, rear view mirrors, bumpers, mudguards, body panels, hoods, clutches, seats and seat covers, steering wheels and steering wheel covers, gear lever knobs, horns, hydraulic circuits, shock absorbers and springs; windshields, windshield wipers, anti-dazzle devices and anti-glare visors for automobiles, namely, automobile windshield sunshades.

IC 014. US 002 027 028 050. G & S: jewelry; ashtrays of precious metal, badges and brooches all of precious metal or plated therewith; watches; clocks; cuff links; earrings; medals; tie clips; tie pins.

IC 016. US 002 005 022 023 029 037 038 050. G & S: adhesives and adhesive tapes for stationery or household use; atlases; maps; paper or plastic bags for packaging; fiction and non-fiction books on a variety of topics; Christmas and gift cards; printed charts; plastic bubble pack for wrapping or packaging; calendars; diaries; paper tapes; blank cards and blank computer disks for recording computer programs; paper mats for use with typewriters and computers; coasters of paper; place mats of paper; printed paper control tokens for use as tickets; filter paper; folders; paper flags; instruction manuals in the field of vehicle maintenance, general feature magazines, and newspapers featuring national, world events and business news; writing, drawing, typing, art, notebook and copier paper; cardboard; paperweights; drawing board pins; mapping pins; corkboard pins; pins for stationery use, namely, push pins; pens; pencils; pen and pencil holders; pencil sharpeners; mounted and unmounted photographs; pictures; paper and plastic handkerchiefs; facial tissues and paper towels; postcards; greeting cards; posters; printed prospectuses; paper ribbons; rubber erasers; drawing and drafting rulers; stands for pens and pencils; paper table cloths; paper table linen, mats and napkins, all of paper; stationery writing cases; bookmarks; paint brushes; paint applicator rollers; voucher books; stationery; hand held printing appliances and imprinters for office use, namely, label printing machines; document files; traveler's checks; payment, pre-payment, and deferred payment cards, authorization cards, charge cards and personal identification cards, namely, debit and credit cards without magnetic coding; printed paper advertising signs; birthday and cake decorations, namely, paper cake decorations.

IC 017. US 001 005 012 013 035 050. G & S: non-metallic hoses and pipes for use in building and construction; insulating oils for transformers; semi-processed plastics products, namely plastics in extruded form for general industrial use; plastics film other than for wrapping, namely, for industrial and commercial packing use, for use as a laminate, for use packaging food in preserving seeds; clutch linings; plastics in extruded form for general industrial use; components and assemblies in molded form for use in manufacture, namely, extruded plastic in the form of bars, blocks, pellets, rods, sheets and tubes for use in manufacturing.

IC 018. US 001 002 003 022 041. G & S: leather and imitation leather and goods made thereof, namely, shopping bags, athletic bags. shoulder bags, travel bags, tool bags, purses, wallets.

briefcases, suitcases and holdalls in the nature of duffle bags; straps for suitcases, briefcases and handbags; umbrellas, parasols and walking sticks.

IC 019. US 001 012 033 050. G & S: asphalt, pitch, bitumen, namely, bitumen based asphalt sealants and bituminous roof coatings; asphaltic bitumen compound, solutions and emulsions of asphaltic bitumen, none being in the nature of paint; asphalt paving; bituminous coatings for roofing; bituminous products for building and road construction, namely, bitumen based asphalt sealant; frameworks and claddings for use in building and civil engineering, not of metal; non-metal chimneys; floor boards and floor tiles, not of metal; huts, joists, laths, lattice work and lintels, none being of metal; macadam, building panels, none being of metal; prefabricated platforms and booms, none being of metal; asphalt and bituminous materials for making and coating roads, paving stones, paving blocks, concrete patching compounds, tar and concrete; damp courses and roof flashing, not of metal; tar, namely for asphalt and concrete patching, sealants for asphalt driveways and roofing; tarred strings for building; wall linings, not of metal, for building; non-metallic tiles; non-metal lattice structures all for use in building and civil engineering; non-metallic geotextiles, namely, erosion-control sheeting and fabrics for construction use.

IC 020. US 002 013 022 025 032 050. G & S: containers not of metal for commercial transport use; wood barrels; plastic boxes, non-metal pallets; drinking straws; non-metallic containers for chemical or petroleum products and petroleum derivatives for commercial use; non-electric fans for personal use; novelty identity license plates, not of metal; containers and container closures of non-metallic material or in which non-metallic materials predominate for commercial use; decorative wall plaques; picture frames; non-metal key rings and key rings with fobs; birthday and cake decorations, namely, plastic cake decorations; fitted fabric furniture covers; interior window blinds; fixed cabinets not of metal for dispensing towels.

IC 021. US 002 013 023 029 030 033 040 050. G & S: non-metal oil cans and drums for household and kitchen purposes sold empty; non-metallic containers for household and kitchen purposes; non-metal abrasive pads for kitchen purposes; namely, pads for cleaning; tankards not of precious metal; small domestic utensils for dispensing doses of household liquid, namely, dispensers for liquid soap or similar household or commercial products, soap boxes; cleansing instruments, namely, sponges, brushes and flannels cloths for cleaning; impregnated cloths for cleaning, dusting and polishing; polishing cloths; portable cold boxes and coolers sold as a unit with sachets for use therewith; deodorizing apparatus for personal use, namely aerosol dispensers not for medical use; boxes for dispensing towels; pads of metal, namely steel wool for cleaning; burners for perfume and domestic incense burners; powder puffs; grass sprinklers; toilet articles, namely, hair brushes and brushes to apply makeup, cosmetic combs and combs for the hair, and facial sponges for applying make-up; toothbrushes, both electric and non-electric; insect traps; meal trays; serving trays for domestic purposes not of precious metal; and bowls, butter dishes, coffee pots not of precious metal, crystal glassware, cups, dishes, drinking glasses and glass beverageware, vases, busts and figurines of glass, porcelain or earthenware; eyebrow brushes; cleaning or dusting cloths.

IC 022. US 001 002 007 019 022 042 050. G & S: tow ropes for automobiles; rope, twine, commercial nets, tents, canvas tarpaulins, sails sacks for the transportation or storage of materials in bulk; geotextile containers and bags made of textile for merchandise packaging; commercial netting for agricultural use; polyolefin fibers not for textile use; textile fibers; non-woven fabrics and felt, namely, acrylic and polyester fibers; carbon fibers for textile use.

IC 023. US 043. G & S: yarn and thread for textile purposes; non-woven fabrics and felt, namely, yarn.

IC 024. US 042 050. G & S: fabric for use in producing furniture covers, clothing and curtains; textile goods, namely napkins, place mats, wall hangings, curtains and towels; bed blankets and table linen; handkerchiefs; unfitted fabric furniture covers.

IC 025. US 022 039. G & S: clothing, namely ties, jerseys, shirts, trousers, underwear, t-shirts, jackets, polo shirts, belts, skirts, dresses, blouses, boiler suits, scarves, sports shirts, sports shorts, belts, gloves and suits; footwear; headgear, namely, anti-glare sun visors, head bands, baseball caps and hats; uniforms; waterproof clothing, namely, rainwear; wet suits for water-skiing and sub-aqua.

IC 026. US 037 039 040 042 050. G & S: lace trimmings used in the manufacture of clothing, table

linens and bed linens; bobbin lace, embroidery, ribbon and shoelaces; buttons for clothing; hooks and eyes; straight pins for sewing and safety pins and needles; zipper fasteners; artificial flowers.

IC 027. US 019 020 037 042 050. G & S: carpets, door mats, rugs, linoleum for use on floors and other hard surface floor coverings; wallpaper, excluding those made from textile material; bath mats.

IC 028. US 022 023 038 050. G & S: games, namely, board games, and card games; toys, namely, stuffed toys, wind up toys, action figures, vehicles, ride on toys, inflatable toys, electronically operated toy motor vehicles; musical toys and mechanical toys; scale model toy vehicles; toy model hobbycraft construction kits for making toys and models; gymnastic and sporting goods, namely, horizontal bars, parallel bars, vaulting horses, athletic wrist joint supports, training stools, sports balls, sports baseball bats, golf clubs, tennis racquets, racquetball and squash rackets, hockey sticks, badminton shuttlecock, skis; Christmas tree decorations; ski wax; automatic and coin operated amusement game machines; playing cards.

IC 029. US 046. G & S: meat, fish for food purposes, poultry in general and game food; meat extracts; preserved, dried and cooked fruits and vegetables; jellies, jams, fruit sauces; eggs, milk and milk products, namely, dairy products excluding ice cream, and frozen yogurt; edible oils and fats; fruit preserves; shellfish for human consumption in general; soups; potato crisps and chips.

IC 030. US 046. G & S: coffee, tea, cocoa, sugar, rice, tapioca, sago; flour and preparations made from cereals, namely, cereal based snack food and breakfast cereals; bread and pastry; flavored ices and ice creams; honey, treacle; yeast, baking powder; salt, mustard; vinegar, sauces; spices; ice; mayonnaise; pies; hot dog sandwiches and hamburger sandwiches; sweets, namely, candy; chewing gum; chocolate; sandwiches; birthday and cake decorations; namely, edible cake decorations; salad dressings; frozen yogurt.

IC 031. US 001 046. G & S: fresh fruits, fresh vegetables, herbs; living plants and flowers, and seeds thereof; flower bulbs and corms; animal foodstuffs for animals, birds, fish and game, none being for medical purposes; animal litter; cut Christmas trees; dried flowers for decoration; agricultural, horticultural and forestry products and grains not included in other Classes, namely, agricultural grain for planting, agricultural seeds, flower bulbs, raw maize, fresh oats, rye seed, chopped straw for animal bedding and raw wheat.

IC 032. US 045 046 048. G & S: beers; mineral and aerated waters and other non-alcoholic drinks, namely, fruit drinks, fruit juices, coffee flavored soft drinks, tea flavored soft drinks, colas, tomato juice beverages, smoothies, soft drinks, energy drinks, soft drinks; namely flavored sodas carbonated soft drinks and syrups for making soft drinks; sweet cider.

IC 033. US 047 049. G & S: wine; hard cider and perry; alcoholic beverages except beers, namely gin, vodka, brandy, whiskey, rum, alcoholic tea based beverages, aperitifs with a distilled alcoholic liqueur base.

IC 035. US 100 101 102. G & S: direct mail advertising; show window display arrangement services; market research; conducting marketing studies; public relations; management of procurement in the nature of purchasing fuel and products for sale in a convenience store situated on a service station; business management services; bookkeeping and financial statement preparation and analysis for businesses all relating to the purchase of and payment for aviation and automotive fuel and related services; accounting; and financial statement preparation and analysis for businesses; business appraisals; bookkeeping; office machine and equipment rental; data processing services; computerized database management; registration services credit cards used for financial transactions; providing business information relating to oil and its derivatives, gas, petroleum, exploration, engineering, chemicals, solar energy, retailing of oil and its derivatives, retailing of general merchandise through retail outlets; business management consultancy; providing a web site which features advertisements for the goods and services of others on a global computer network; provision of information for business purposes on the Internet relating to oil and its derivatives, gas, petroleum, exploration, solar energy, engineering, chemicals, retail outlets featuring oil and its derivatives and general merchandise; on-line trading services in which seller posts products to be auctioned and bidding is done via the Internet with goods identified as oil, oil derivatives, gas, goods in connection with the production of solar energy, chemicals, provision of on-line procurement facilities, namely,

purchasing of oil, oil derivatives, gas. goods for use in production of solar energy, goods for use in connection with exploration, chemicals, general merchandise sold through retail outlets situated on service stations sites for others via a global computer network; photocopying services; business advice on the purchase of goods for sale through convenience stores, service stations, take-away food counters, bakeries, cafes, restaurants, and vending machines; business management, namely, management of customer loyalty, incentive or promotional schemes; business management and consultation, namely, providing advice on the operation of bakeries, take-away food counters, cafes, restaurants, service stations and convenience stores, procurement of stock for retail stores; retailing services relating to filling stations and shops located on filling stations, namely, retail store services featuring convenience store items and gasoline; retail convenience store services; discount card services, namely, promoting the goods and services of others through the distribution of discount cards; services comprising organizing the scheduling of product transport, including on line services for same, namely, scheduling services for transportation of goods from manufacturers to customers; retail gasoline supply services; management of campground accommodation for others; retail bakery outlet shops within general convenience stores; rental of vending machines; retail franchising services in the establishment or operation of service stations, retail convenience stores situated on service station sites, restaurants, hotels/motels and car washes; operation of a business for others; namely, automobile service stations. transportation logistics services, namely, arranging for the transportation of goods, namely, chemicals, chemical products, oil, oil derivatives, gas. goods for use in producing solar energy goods for use in exploration, and goods for use in convenience stores; online transportation logistics services, namely, planning and scheduling shipments of goods via air, sea, rail and land.

IC 036. US 100 101 102. G & S: financial management and consultancy; financing services; loan financing; promoting the sale of items by offering the sale of same on credit terms; credit card services, namely, issuing of payment, pre-payment and deferred payment credit cards; credit card services using transponder-based systems providing prepayment and deferred payment for goods or services; purchasing management consultancy in the nature of providing advice concerning financial aspects of purchasing fuels and goods for sale in convenience stores situated on a service station; financial clearing house services; payment processing, namely, electronic processing and transmission of bill payment data; rental and leasing of real estate; credit card services in the nature of issuing payment card, pre-payment card, deferred payment cards, and authorization of purchases for credit card transactions; cash card services, namely, cash replacement rendered by credit card; financing of purchases, namely chemicals, goods for use in producing solar energy, oil, oil derivatives, gas, goods sold through convenience stores situated on service station sites, goods for use in the exploration for oil and gas; electronic funds-transfer and cash dispensing services, namely, electronic cash transactions; financial analysis and consultation relating to the issue of statements of account; bill payment processing services; financial services in the nature of an investment security; insurance consultation and insurance brokerage services; guarantee services, namely financial guarantee and surety and guarantee insurance underwriting; administration and management of employee pension funds; on-line employee pension fund information and administration services; charitable fund raising; financial sponsorship of educational and charitable events. on-line trading of stocks, bonds and other securities; office services, namely, leasing and rental of office space.

IC 037. US 100 103 106. G & S: anti-rust treatment for vehicles; asphalting; aircraft, land vehicle and trailer cleaning, polishing, greasing, lubrication, maintenance and repair; motor vehicle washing; furnace installation and repairs; vehicle tire re-fitting and repair; heating equipment installation and repair; laundry services; leather care, cleaning and repair; construction of power generating plants; installation, maintenance, repair and servicing of gas supply and distribution apparatus and instruments; repair, maintenance and servicing of gas apparatus and instruments; machinery installation, maintenance and repair; pipeline construction and maintenance; pump repair and maintenance; vehicle service stations and vehicle fuelling station services; painting or repair of signs; maintenance, repair and care of ships. oil rigs and aircraft; office services, namely, installation and repair of business office machinery and equipment; refueling services for ships, boats. aircraft and land vehicles; refueling services for land vehicles, ships, boats and aircraft.

IC 038. US 100 101 104. G & S: facsimile transmission services, telex and telephone transmission services; message sending services by electronic transmission; telecommunications, namely, facsimile transmission services, telephone services, Internet and extranet transmission services and ISTN transmission services; providing access to the Internet, namely, providing telecommunications connections to a global computer network; Internet café services, namely, providing on-line chat rooms for transmission of messages among computer users concerning topics of general interest.

IC 039. US 100 105. G & S: vehicle rental, namely, car, truck and trailer rental; vehicle towing; vehicle parking; transportation of freight by air, sea, rail or land; packaging of articles for transport, sale and storage, storage of ships; transportation by air, land, sea and rail; and storage of fuel, oil, petroleum, gas and lubricants; public utility services in the nature of transmission, supply and distribution of electricity; transmission of oil and gas by pipeline; marine transport services; chartering of ships or space on ships for transport of freight.

IC 040. US 100 103 106. G & S: fuel oil, used lubricants and gas treatment services; recycling of plastics; generation of gas and electricity; oil and gas refinery services; providing information on treatment of materials, namely, on-line provision of information on treatment of materials, namely, gas, oil, water and other forms of energy.

IC 041. US 100 101 107. G & S: educational services taking place off the premises of a school or other educational establishment in the fields of oil, gas and petrochemicals, science health, safety and environment, namely, conducting classes, seminars, conferences, workshops and on the job training in the fields of oil, gas and petrochemical industries, science, health, safety and environment; arranging and conducting international educational conferences between schools in different countries, and providing multi-lingual science teaching units for that purpose; publication of books; organization of competitions, namely, entertainment in the nature of competitions in the field of sports and business; providing non-downloadable electronic publications, namely newsletters and magazines in the fields of chemicals, gas, oil, solar energy and exploration, retailing and engineering; electronic games services on the Internet, namely providing and on-line computer game; computer education training services in the use and operation of computer software for organizing the scheduling of product transport, monitoring performance and reporting thereon; training in the use and operation of petrochemicals production facilities; recreational services in the nature of children's playgrounds at service stations; entertainment services, namely, organization of competitions for others for commercial or advertising purposes.

IC 042. US 100 101. G & S: provision of facilities for conferences, namely, providing convention facilities; computer programming for others; rental of computers; design of computer software for others; design and maintenance of computer programs for organizing the scheduling of product transport, and reporting thereon via on-line, telephone, e-mail and in person; architectural and interior design services for retail and wholesale outlets; rental of uniforms; chemical analysis services for oil field exploration; oil-well testing; oil prospecting; conducting engineering services of oil-fields; tests and inspection for early damage diagnosis in oil-field and oil conducting plant, equipment and systems; marine, aerial and land surveying; design of equipment for use in industrial processes; horticultural services; management analysis and testing of oil and gas fields, namely, oil and gas field exploration; liaison services to facilitate the exchange of technical and technological information, namely, technical consultation and research in the fields of geology, engineering, exploration, solar energy, chemicals, oil and oil derivatives, gas and the production of energy; commissioning and inspection of plant, machinery and apparatus in the fields of geology, engineering, exploration, solar energy, chemicals, oil and oil derivatives, gas and the production of energy; non-medical technological analysis services in the fields of exploration, chemicals, oil and oil derivatives, solar energy production, gas and engineering; legal representation; exploitation of industrial and intellectual property, namely, intellectual property consultation and the licensing of intellectual property; rental of rooms; travel agency services, namely, booking of campground accommodations; architectural advice and consultancy services; computer software consultancy; weather information services. namely, weather forecasting and weather reporting; preparation of engineering drawings, technical documentation and reports for others; professional advisory services relating to lubrication and maintenance of engines and machinery; consultancy, advisory, survey, technical consultation, scientific research, product research and design services, all in the fields of engineering, chemicals, gas, oil and oil derivatives, solar energy, exploration and environmental issues industries, engineering, computers, oil, chemicals, plastics, retail store design, environmental impact of process plant; legal advice; consultancy services relating to the filing and prosecution of applications for registration of intellectual property via on-line, telephone, e-mail and in person; office services, namely, office coffee supply services; personal identification card, namely, preparation of identification cards; providing multilingual science teaching units, namely, language interpreting for international conferences between schools in different countries; computer services, namely providing on-line newsletters and magazines in the fields of chemicals, petroleum, gas, engineering, solar energy and exploration; patent exploitation and licensing of intellectual property in the chemicals, oil and oil derivatives, solar energy, engineering, exploration and natural energy fields.

IC 034. US 002 008 009 017. G & S: tobacco; cigars; cigarettes; smoker's articles, namely, tobacco smoking pipes, matches, cigarette papers, ashtrays, not of precious metal, cigarette lighters, not of precious metal and cigarette cases, not of precious metal.

IC 045. US 100 101. G & S: security services, namely, security guard services and monitoring security systems and consultation services related thereto.

IC 044. US 100 101. G & S: providing public bath, shower, sauna and toilet facilities; health and beauty care; hairdressing salons and barbershops; massage services.

IC 043. US 100 101. G & S: hotel services; cafe, cafeteria; canteen, catering, restaurant and snack bar services; take-away food services, namely, carry-out restaurants; provision of food and drink, namely, bar services and contract food services.

| | |
|---|---|
| Mark Drawing Code | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| Design Search Code | 260107 260117 260121 |
| Serial Number | 76193397 |
| Filing Date | January 16, 2001 |
| Current Filing Basis | 44E |
| Original Filing Basis | 1B;44D |
| Owner | (APPLICANT) BP p.l.c. COMPANY BY CHANGE OF NAME UNITED KINGDOM 1 ST. JAMES'S SQUARE LONDON SW1Y 4PD ENGLAND |
| Assignment Recorded | ASSIGNMENT RECORDED |
| Attorney of Record | Donald C, Knapp, Jr. |
| Priority Date | July 21, 2000 |
| Prior Registrations | 0654019;0880189;1854364;2394622;AND OTHERS |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST
NEXT LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

JS 44 11/99      **CIVIL COVER SHEET**  COUNTY IN WHICH THIS ACTION AROSE: *Macomb*

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**I. (a) PLAINTIFFS**

*Armada Oil and Gas Co.*

**DEFENDANTS**

*NAS Company, Corporation*
*Marathon Flint Oil Company*

(b) County of Residence of First Listed   *Wayne*

County of Residence of First Listed   *Macomb*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(C) Attorney's (Firm Name, Address, and Telephone Number)
*Alex Saleh (P56756)*     (313)
*Saleh & Associates, PLC,*      724-
*921 Howard, Dearborn, MI 48124*    8080

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

|  | PLA | DEF |  | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**      (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment and Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault Libel And Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury-Med. Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☑ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**V. ORIGIN**      (PLACE AN "X" IN ONE BOX ONLY)

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multi district Litigation
- ☐ 7 Appeal to District Judge from Magistrate

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

*15 U.S.C. 1114  Infringement on and unauthorized use of BP trademark*

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    $DEMAND

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY:**  (See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   *1/19/06*

SIGNATURE OF ATTORNEY OF RECORD   *Douglas [signature]*

# PURSUANT TO LOCAL RULE 83.11

1.  Is this a case that has been previously dismissed?

    ☐ Yes
    ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.  Other than stated above, are there any pending or previously
    discontinued or dismissed companion cases in this or any other
    court, including state court? (Companion cases are matters in which
    it appears substantially similar evidence will be offered or the same
    or related parties are present and the cases arise out of the same
    transaction or occurrence.)

    ☐ Yes
    ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :